# United States Court of Appeals
## For the First Circuit

No. 10-1086

UNITED STATES,

Appellee,

v.

CARLOS ESPINAL-ALMEIDA, a/k/a Carlo,
Defendant, Appellant,

No. 10-1090

UNITED STATES,

Appellee,

v.

CÉSAR HERNÁNDEZ-DE LA ROSA,
a/k/a César Hernández-La Rosa,
a/k/a Benino Mariano-Santana,

Defendant, Appellant,

No. 10-1134

UNITED STATES,

Appellee,

v.

JACOBO PEGUERO-CARELA, a/k/a Berzano Mercedes,

Defendant, Appellant,

No. 10-1440

UNITED STATES,

Appellee,

v.

SATURNINO TATIS-NÚÑEZ,
a/k/a Sotunino Tati, a/k/a Sotunino Núñez,

Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen C. Cerezo, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

José R. Olmo Rodríguez for appellant Carlos Espinal-Almeida.
Mariángela Tirado-Vales on brief for appellant César Hernández-De la Rosa.
Ignacio Fernández de Lahongrais on brief for appellant Jacobo Peguero-Carela.
Jay Markell for appellant Saturnino Tatis-Núñez.
Carlos R. Cardona-Torres, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Luke Cass, Assistant United States Attorney, were on brief, for appellee.

November 14, 2012

**THOMPSON**, **Circuit Judge**. An undercover United States Customs Task Force operation involving efforts on land, at sea, and in the air, ended with the arrests of the defendants, Saturnino Tatis-Núñez ("Tatis"), César Hernández-De la Rosa ("Hernández"), Carlos Espinal-Almeida ("Espinal"), and Jacobo Peguero-Carela ("Peguero"). Each was indicted on, and ultimately convicted of, one count of conspiracy to possess with intent to distribute, and one count of conspiracy to import, 418 kilograms of cocaine. They all appeal, raising a myriad of challenges that span jury voir dire to sentencing. After carefully considering each claimed error, we affirm.

## I. BACKGROUND

### A. The Undercover Operation

Sergeant Richard Avilés ("Avilés"), a twenty-six-year veteran of the Puerto Rico Police Department and eight-year member of the U.S. Customs and Border Protection ("Customs") Task Force, received information that certain individuals were looking to recruit boat captains for the purpose of transferring drug loads via water from the Dominican Republic to Puerto Rico. Avilés was assigned to go undercover as a boat captain, "Tony," in order to infiltrate the drug trade.

As part of the undercover operation an informant working with law enforcement took Avilés to meet Orlando Carrero-Hernández ("Carrero") on January 10, 2008 to discuss the prospect of Avilés's

working for Carrero and picking up a drug load.[1]  This meeting, which took place in Puerto Rico, was photographed and recorded.  At the meeting, Avilés signed on to pick up 600 kilograms (or kilos) of cocaine from another boat in the middle of the ocean.  In a subsequent phone call with Carrero the amount was reduced to 300 kilos.

## B.  The Drug Exchange

After some hits and misses, the drug exchange finally took place on January 25, 2008.  On that day, Avilés met with Carrero and Joaquín Lassalle-Velázquez ("Lassalle").[2]  Carrero gave Avilés $450 for fuel, a piece of paper with the coordinates of where the two boats would meet at sea, and the password to signal to the other boat crew carrying the drugs.

After the meeting, Avilés returned to his office and made a photocopy of the coordinates and also met another officer who was to accompany him on the undercover ("UC") boat.  Together they headed to the UC boat where they met up with two other officers who would be posing as the crew.  Avilés briefed the trio and the two officers who were going to pilot the boat plugged the coordinates Avilés had received from Carrero into the UC boat's global

---

[1] Carrero was the fifth defendant before the district court. He pled guilty on day two of trial.

[2] Lassalle was the sixth defendant before the district court. He pled guilty on the morning trial was set to start.

positioning system ("GPS") device.  The UC boat set off to sea to meet the mothership.[3]

Avilés and his crew reached their destination around 8:00 p.m.  Encountering turbulent waters, they circled around the area for approximately one hour.  Then Avilés "noticed a yola[4] in the sea" and heard voices.  Avilés yelled out in the darkness, "hey, man -- hey, man. You, Domi."  A voice replied, "what's going on, Bori?"  Avilés shouted back, "I'm coming, coming from Chino," and then the password, "Chino sends me."  "Immediately, there was a whole bunch of . . . noise" and the yola  "slowly got closer" to the UC boat.

The seas were rough -- so rough that the yola hit the UC boat twice.  Avilés and his crew took a moment to put "fenders" up around the UC boat to avoid damaging it.  Then he asked of the other boat, "what's going on? What does he have? What's there?"  A voice replied, "nine bags."  One of Avilés's crew members then turned on a light and Avilés looked directly at the mothership.  While the light was on, Avilés saw one individual (later identified as Hernández), whom he referred to as "the captain of the vessel,"

---

[3] "Mothership" is a law enforcement term used to refer to the target of an investigation.  In this case, a boat that was suspected of carrying contraband.

[4] A yola is a small fishing boat.  For purposes of this opinion, reference to the "yola," "mothership," and "michera" will be used interchangeably.

-5-

maneuvering two motors at the same time, a feat Avilés found abnormal and "impressive."

After the light was quelled, the two boats started moving in toward one another to enable the crews to make the drug exchange. By 9:15 p.m. the two boats were floating in tandem. Using only their hands and a pole, the two boats managed to stay close enough to keep the drugs from falling into the water. According to Avilés, the crew of the mothership would put the drugs on the edge of their boat and then Avilés would grab the package and put it on the UC boat's floor. At one point during the exchange, a crew member from the mothership accidentally threw one of the kilos on top of Avilés's hand. Avilés shouted out, "shit, Domi. You broke my hand. You broke my hand." Immediately a light in the UC boat was turned on and Avilés was able to see the crew member (later identified as Espinal), who stood directly in front of him.

A heated argument then arose because the mothership crew complained that the light had been left on too long. After the exchange of words, the remaining sacks of drugs were transferred to the UC boat and sometime before 9:25 p.m. the two boats parted ways. Avilés and the UC boat headed for Aguadilla, Puerto Rico to rendevous on a beach with Lassalle and Carrero, where hidden Immigration and Customs Enforcement ("ICE") agents and Puerto Rico

Police officers lay in wait.  The UC boat stopped along the way to swap out the kilos of cocaine for fake kilos.[5]

## C.  Air Patrol

Meanwhile Victor Cancel ("Cancel"), a Customs aviation enforcement officer, was also assigned to assist in the undercover operation.  Using aircraft equipped with special sensors, Cancel routinely patrols the coastal waters of Puerto Rico and the Virgin Islands in order to detect and prevent illegal immigrant and drug trafficking.  On this particular mission, Cancel was part of a four person aircraft crew and, more specifically, was the camera operator.  The aircraft crew was given instructions "to fly to the area and locate and track the mothership," "observe the sea transfer," and "follow the mothership until [it was] intercepted by

---

[5] The plan was for Avilés to arrive on the beach and start unloading the sacks of fake drugs.  Once he had handed off the first sack to Carrero and Lassalle, he was going to give a predetermined signal at which time a light would be turned on and the officers would move in and make the arrests.  The plan never came to fruition though because the officers ended up moving in before Avilés got there at which time a shootout took place between the individuals waiting for the drugs (it is unclear exactly who, though at least Carrero and Lassalle were there) and the officers.  The sequence of events at this point is not clear and the briefs and the evidence offered at trial do not shed much light.  But based on Carrero and Lassalle's sentencing hearing transcript it seems that the pair fled from the beach, one or both of them in Lassalle's pick-up truck, from which one officer claimed shots were fired.  They were each arrested separately a few days later.

the U.S. Coast Guard."[6]  In other words, Cancel and the crew were told to stay with the mothership "at all times."

The aircraft took off around 7:45 p.m. heading toward the coordinates where the UC boat was scheduled to be at 9:00 p.m.  A boat was identified on the aircraft's radar.  It was at the coordinates Cancel had been given and at the time "was just sitting there, was not moving, [and] was waiting," and so Cancel "knew it was the UC boat."  The aircraft crew then scanned the area for the mothership.  Through the use of radar, color lenses, and observation out of the aircraft's windows, they detected a few boats in the area.  Cancel and the crew focused in on one small boat because it was headed "directly towards where the UC boat was."

The aircraft's camera was trained on the boat (which was already being tracked by radar) and Cancel received his first image of the vessel.  The aircraft moved in closer (one mile above the boat) to get a better look via a zoom lens camera.  Using the camera, Cancel and the crew were able to identify the vessel as a

_____

[6] The detection equipment used by the aircraft crew included a camera that allowed for audio, video, and backup recording.  It was comprised of three different lenses: "a complete zoom-in lens," "an adjustable zooming in . . . lens,"  and "a forward-looking infrared camera that . . . detects the contrast of the heat in the background" and is "specifically used at nighttime."  The section of the camera that recorded video had two digital video recorders ("DVR") which held the video, and from which the videos could be retrieved and transferred to a DVD disc.  There was also a special radar, similar to a satellite dish, "attached to the belly of the aircraft."

-8-

"michera," a small fishing boat that is built in the Dominican Republic and in Cancel's experience, one commonly used by drug smugglers to conceal their drug loads.

The aircraft then followed the michera, recording video and taking still pictures of it as it neared the UC boat and eventually came along side it. Cancel and the crew continued to observe the michera, video recording as the actual drug exchange took place. Cancel did not take still pictures of the exchange because protocol dictates, he said, that when a UC boat is involved the aircraft is supposed to "stay away" and "not interrupt the sea transfer" -- this also ensures that Cancel can keep the boats on camera and radar at the same time.

After the exchange was complete, the UC boat and michera went their separate ways and Cancel and his crew (in accordance with their instructions) stayed with the michera. They tracked it, while giving information about its location to a waiting U.S. Coast Guard cutter.[7] Cancel and the crew continued to observe and take pictures of the michera as it was intercepted by the cutter, and boarded by Coast Guard officers. After observing the interdiction, the aircraft flew off to support the second part of the mission -- filming the on the beach drug drop-off.

---

[7] A cutter is a large Coast Guard boat.

### D. Sea Patrol and the Interdiction

Jaime Cabán Morales ("Cabán") was one of the Coast Guard officers aboard the cutter. His job was to "move in and apprehend the suspects" after the air crew gave word the drug exchange had been completed. Once word came, Cabán and three other officers deployed in a small inflatable boat to the mothership and arrived sometime around 10:40 p.m. Identifying himself as a Coast Guard officer, Cabán ordered all onboard "to keep their hands up where [he could] see them." Cabán and his crew boarded the mothership and found the four defendants.

After handcuffing the four, Cabán spoke with the defendants who claimed to be out on a fishing trip. They said they had headed out, and obtained a fishing permit, from a marina in the Dominican Republic. None of the defendants had identification or registration for the boat. Cabán asked about weapons on board and he was told there was one, a 9 mm gun, which was located and secured. Cabán and the officers then performed a sweep of the boat, recovering ammunition, a GPS, and four cell phones. Cabán found only minimal fishing equipment and no fish, though he did find a fishing permit, which had been issued from the Dominican Republic.

Cabán then gave the cutter the all clear and it came up alongside the michera and the inflatable Coast Guard boat. Three of the defendants, along with the items seized from the michera,

-10-

were transferred to the cutter. Cabán and the three boarding officers remained on the michera with one of the defendants (it is unclear which, though we suspect it was Hernández because Cabán refers to the defendant who remained behind as the "master"). Both the cutter and the michera then headed to Mayagüez, Puerto Rico, arriving the next morning (it is uncertain if they arrived at exactly the same time). They moored alongside each other and the defendant who had been traveling on the michera was reunited with the other defendants aboard the cutter.

### E. Land Patrol

Omar Villarubia Ruiz ("Villarubia"), a Puerto Rico police officer assigned to the Customs Task Force, was involved in various aspects of the operation on land. First, he was one of the officers hiding by the beach in Aguadilla, waiting for Avilés to hand the fake kilos off to Lassalle and Carrero. Villarubia and another police officer, concealed in the bushes with a night-vision video camera, recorded what happened on the beach that night.[8] After filming the scene, Villarubia was tasked with going to Mayagüez where, the following morning, he was waiting when the Coast Guard officers arrived with the defendants. He photographed the four defendants and helped transport them. At some point,

---

[8] It is unclear what part of the night's events were recorded, whether it was surveillance while the officers waited, the shootout, Carrero and Lassalle's flight, or some combination of these things.

-11-

Villarubia also went to the police station where he field-tested, organized, and packed the seized drugs.

ICE Special Agent Victor Manuel Ramos ("Ramos") also participated in the operation. Ramos met with Coast Guard personnel at the Mayagüez seaport to assist in securing the evidence and transporting the four defendants.

## F. The Trial

The defendants were each indicted on one count of conspiracy to posses with intent to distribute a controlled substance (21 U.S.C. § 841) and one count of conspiracy to import a controlled substance (21 U.S.C. §§ 952, 960, and 963). The four defendants were tried together, with trial starting on September 14, 2009. The defense theory, as evidenced by opening statements, was that the defendants were wrongfully arrested fisherman out on an innocent fishing trip. Defense counsel theorized that Cancel and the air surveillance team momentarily lost sight of the actual mothership after the drug exchange had occurred. They claimed the air team then caught sight of the defendants' fishing boat and wrongfully assumed it was the mothership.

The government painted a different picture during the five day trial. It presented evidence that pointed to the defendants' guilt. Those involved in the overall undercover and interdiction operation were called as witnesses, including Avilés, Cancel, and Cabán. To rebut the wrongfully-targeted-boat theory,

Cancel testified that he and the aircraft crew never lost sight of the michera because they tracked it the entire time with the aircraft's camera. Still pictures taken by that camera were introduced, showing the michera before and after the drug exchange, and Cancel testified that these photographs all depicted the same boat. The government also introduced the data extracted from the michera's GPS (much more on this later) and video taken by Cancel (more on this too). At the close of the government's case, all defendants moved for a judgment of acquittal. The district court denied the motions. The defendants then sought to call a maritime expert witness, however, the court would not allow the testimony. The defense had no other witnesses to call and no evidence to present, and so each side gave its closing argument. After about an hour and a half, the jury returned guilty verdicts for all four defendants on both counts. These appeals followed.

## II. DISCUSSION

The defendants each assert multiple claims of error.[9] We

---

[9] Espinal, in addition to advancing his own arguments, seeks to join in the other co-defendants' arguments pursuant to Fed. R. App. P. 28(i). He has failed to do so properly. This court has stated that "[a]doption by reference cannot occur in a vacuum and the arguments must actually be transferable from the proponent's to the adopter's case." United States v. Brown, 669 F.3d 10, 16 n.5 (1st Cir. 2012). Further, "issues that are adverted to in a perfunctory manner absent developed argumentation are waived." Id. In this case, Espinal's attempt to join in the other co-defendants' arguments could not have been more perfunctory -- he merely stated that he "joins in any and all other arguments raised by the other criminal co-defendants . . . that . . . are applicable to his case." Accordingly, Espinal's "attempted arguments by reference

-13-

will address each argument in seriatim, providing additional facts as needed.

## A. Jury Voir Dire

### 1. Ex Parte Conversations

At trial the judge conducted portions of the jury voir dire ex parte, and Peguero, Tatis, and Hernández claim this practice impinged on an assortment of rights. What happened was this. During jury voir dire, the district court asked the venire if their impartiality would be affected because the case involved narcotics. In response to one juror's reply that she "consider[s] people who are involved [in] selling drugs [as] actual slave masters," the court excused her and defense counsel requested a sidebar. At sidebar, Carrero's counsel[10] stated that he would "prefer" if future "points of view" could be shared "at the bench." Both Hernández's and Tatis's counsel expressed identical concerns to the judge. Tatis's counsel added that she had "filed a motion for proposed voir dire which included approaching the bench."

The judge then addressed the venire explaining to them that the juror had been excused because "she expressed this firm opinion," but did not know all the facts of the case. The judge went on to say that as jurors, they needed to be "open minded and

are forfeited." Id.

[10] Carrero was still in the case at this point. He pled out the following day.

-14-

. . . get to know the facts first before [they] make a decision."

She added that if any member of the venire had "a particular

opinion as severe" as the excused juror, she would prefer that they

share their opinions up at the bench.  Going forward, when a

sidebar discussion was requested by a potential juror or desired by

the court, the judge spoke privately with the juror at the bench,

but nonetheless on the record, while all the attorneys remained at

counsel table.  The judge then reported what the juror said in open

court to the attorneys and in the defendants' presence.  None of

the defendants objected to this practice.

On appeal Peguero and Tatis argue that the ex parte jury

voir dire process described above violated their Sixth Amendment

right to a public trial and to be present.[11]  Hernández does not

make a constitutional argument but rather claims the practice

violated Rule 43(a) of the Federal Rules of Criminal Procedure,

---

[11] In support of their public trial argument, Peguero and Tatis rely on Presley v. Georgia, 130 S. Ct. 721 (2010) (per curiam) and Owens v. United States, 483 F.3d 48 (1st Cir. 2007).  However, both cases are factually inapposite as they involve total courtroom closures in which the public was excluded from jury voir dire.  See Presley, 130 S. Ct. at 722; Owens, 483 F.3d at 54.  Both also involved preserved claims.  In Presley, the defendant objected to the closure at trial.  See 130 S. Ct. at 722.  In Owens, the defendant did not object at trial, but did request an evidentiary hearing on his public trial claim in a habeas petition and it was the denial of this request that this court was reviewing.  See 483 F.3d at 61.

which requires that the defendant be present at every stage of the trial.[12]

Because none of the defendants objected to the procedure utilized by the court, our review is for plain error. See United States v. Rivera-Rodríguez, 617 F.3d 581, 600-04 (1st Cir. 2010). To establish plain error, a defendant must show that (1) an error occurred, (2) the error was obvious, (3) the error affected substantial rights, and (4) the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings. See United States v. Delgado-Hernandez, 420 F.3d 16, 19-20 (1st Cir. 2005).[13]

We have dealt with this type of jury voir dire situation before in United States v. Rivera-Rodríguez. In that case, the district court on its own initiative engaged in ex parte communications with fifteen potential jurors during jury selection, without objection from defense counsel. See Rivera-Rodríguez, 617 F.3d at 601-02. As is the case here, the defendants argued on

---

[12] Hernández also makes a passing argument that the district court further erred because some of the ex parte discussions were in Spanish. While 48 U.S.C. § 864 requires that all proceedings in the United States District Court for the District of Puerto Rico be in English, Hernández provides no developed argument for his position, and so we decline to fill in the blanks for him. See Colón v. R.K. Grace & Co. 358 F.3d 1, 6 (1st Cir. 2003).

[13] Because many of the issues that the defendants raise on appeal are not preserved, we will be applying this standard throughout but not necessarily reiterating all of the elements each time.

appeal that the practice violated their Sixth Amendment right to a public trial and their right to be present under Rule 43(a). See id. at 600. This court, which found the ex parte voir dire process "troubling," assumed arguendo that the first two prongs of plain error had been satisfied, namely that an obvious error had occurred. Id. at 588, 600. This court went on to find that the third prong, requiring a substantial affect on a defendant's rights, had not been satisfied. See id. at 605. Only two of the jurors who participated in the ex parte communications were selected to serve on the jury and so we found no basis to conclude that these two ex parte communications, or the resulting jury composition, violated the defendants' rights or affected the trial's outcome. See id. at 601, 604-05. As was the case in Rivera-Rodríguez, the defendants cannot satisfy prong three.

Here only one juror who engaged in ex parte communications with the court was ultimately selected for service. She was a student who very briefly spoke with the judge at the bench, but on the record, about her school schedule and whether it would affect her ability to serve. The judge then immediately notified counsel of the contents of the discussion and no one claims the court incorrectly reported the juror's concern (or for that matter the concerns expressed by any of the jurors the judge spoke with at the bench). We find no likelihood that this ex parte conversation about personal scheduling somehow tainted the jury

-17-

composition or affected the defendants' statutory rights, constitutional rights, or the trial's outcome. Because defendants have failed to satisfy the third prong, we need not consider the fourth; no plain error has been shown.[14]

## 2. Law Enforcement Bias Question

Hernández argues that the district court should have asked the jury venire a specific question, to wit "would [you] give added credence to testimony by agents or government employees," to ensure that no one was biased in favor of law enforcement. Hernández never asked the district court to make this particular inquiry and so we review for plain error. See Rivera-Rodríguez, 617 F.3d at 600.

"The Supreme Court has held that a defendant's right to an impartial jury can be satisfied without the court's inquiring into every specific prejudice feared by the defendant." Therrien v. Vose, 782 F.2d 1, 4 (1st Cir. 1986) (citing Ristaino v. Ross, 424 U.S. 589, 595 (1976)). Our review of the voir dire transcript reveals that the court took sufficient measures to guard against jury bias favoring law enforcement. See Therrien, 782 F.2d at 4. First, the court asked if any of the potential jurors were familiar

---

[14] As a brief aside, though the defendants do not prevail on this issue, the ex parte jury voir dire practice that they have called our attention to is not optimal. As we have said before, "we think it unwise for district judges to engage in ex parte voir dire beyond purely ministerial functions." United States v. Candelaria-Silva, 166 F.3d 19, 31 (1st Cir. 1999). We reiterate that message here.

with or had "a close relationship with any . . . Federal prosecutor." It further inquired whether any member of the venire was a "Federal law enforcement officer or a Puerto Rico law enforcement officer," and if they "had a close association with a Federal law enforcement officer by friendship or otherwise . . . [l]ike, for example, that you're a very close friend to an FBI Agent, and the FBI Agent tells you about all the things they do and how they do them." These inquires were adequate to weed out potential jurors who might be partial to law enforcement. In fact, three jurors were excused because they were law enforcement officers or had ties to a law enforcement officer. There was no error; we need go no further.

### 3.  Excluded Spectator

Espinal claims the district court wrongly excluded a spectator from the courtroom during jury voir dire in violation of his Sixth Amendment right to a public trial. However, there is no record support for this contention.[15] Without such support, we are unable to address Espinal's claim. The argument is waived. See Conto v. Concord Hosp., Inc., 265 F.3d 79, 81-82 (1st Cir. 2001) (finding a claim waived because the appellant did not comply with

_____

[15] Prior to oral argument, Espinal filed a motion with this court seeking to submit a sworn statement from the allegedly excluded spectator, Espinal's brother-in-law. The motion was denied. Espinal then filed a motion to remand his case to the district court for further proceedings on the exclusion issue. This motion was also denied.

the Federal Rules of Appellate Procedure's requirement that the appellant rather than the court "ferret out and articulate the record evidence considered material to each legal theory advanced on appeal.")

## B. In-Court Identifications

The district court erred, all of the defendants assert, when it did not suppress identification evidence on due process grounds. On a preserved claim, we review a district court's decision to admit or suppress identification evidence de novo and the underlying findings of fact for clear error. See United States v. De León-Quiñones, 588 F.3d 748, 753 (1st Cir. 2009). However, when a defendant fails to object to the admission of the identification evidence below, we review only for plain error. See id. Here, Espinal and Hernández objected at trial, and Tatis and Peguero did not.

Identification evidence is for the jury in all but extraordinary cases and typically a "court should suppress identifications made before trial and in the courtroom on due process grounds only if it is persuaded that there was a very substantial likelihood of irreparable misidentification." United States v. Rivera-Rivera, 555 F.3d 277, 282 (1st Cir. 2009) (internal quotation marks and citation omitted). To determine whether suppression is called for, we apply a two-step analysis. We consider first whether the identification procedure that

preceded the identification was unnecessarily suggestive. See id. at 283. If it was, then we ask whether the identification itself is reliable notwithstanding the suggestive procedure. See De León-Quiñones, 588 F.3d at 753. If the identification is reliable, it is admissible. See id.

Reliability is the key; it is assessed by evaluating the totality of the circumstances and the analysis is witness specific. See id. at 753, 754. Some of the factors to be considered in assessing reliability are: "'(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; [and] (5) the length of time between the crime and the confrontation.'" Id. at 753-54 (quoting United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003)). This two-step inquiry into suggestiveness and reliability applies when a defendant (as two of them here do) alleges that his in-court identification was "tainted by an unnecessarily suggestive confrontation that occurred outside the presence of the jury." Id. at 754.

### 1. Espinal's Identification

At trial, Avilés identified Espinal as the individual on the mothership who was directly in front of him when the light came on a second time after a bag of drugs had been dropped on Avilés's

-21-

hand.  Espinal has two issues with this in-court identification.  First, he claims it was tainted because Avilés saw Espinal's photograph after the drug exchange and before he testified at trial.  Specifically, three days after the undercover operation concluded, Avilés, at the request of a colleague, downloaded photographs of the four defendants from the colleague's camera to a compact disc.  Espinal labels Avilés's encounter with the photographs, which he likens to a photo show-up, as unnecessarily suggestive.  Second, Espinal contends that based on the circumstances surrounding his and Avilés's encounter, Avilés's identification is unreliable.  Espinal points out that the drug exchange occurred at night, with virtually no lighting, on rough seas, and in a tense situation.  Espinal concludes that under these conditions Avilés could not have possibly gotten a good enough look at Espinal on which to base his later in-court identification.  He theorizes that Avilés's identification was based on what he saw in the photographs, as opposed to what he saw that night at sea.

We start our inquiry by asking whether there was an unnecessarily suggestive identification procedure that preceded the identification.[16]  See De León-Quiñones, 588 F.3d at 753.  Our

[16] For some time this court has adhered to the approach that all suggestive identification procedures, not just those orchestrated at the hands of police, should be scrutinized.  See United States v. Bouthot, 878 F.2d 1506, 1516 (1st Cir. 1989).  However, following a disagreement among the circuits, the Supreme Court recently took up this issue and said otherwise.  See Perry v. New Hampshire, 132 S.Ct. 716 (2012).  Citing the aim of deterring law enforcement from using improper line-ups and photo arrays, as

ability to answer this question is complicated by the fact that we do not know much about the circumstances surrounding Avilés's viewing of the photographs. On cross-examination Avilés testified that he saw photographs of the defendants prior to trial because, a few days after the undercover operation, he was asked by a colleague to transfer photographs of the four defendants from that colleague's camera to a CD. Defense counsel did not explore this issue any farther, or elicit any additional information. For example, we do not know what exactly the pictures depicted (e.g., were these pictures of Espinal and the others in handcuffs) or the circumstances of the requested download (e.g., did the colleague tell Avilés that these were the guys who were arrested).

_____

well as the built-in safeguards that protect against juries placing too much emphasis on eyewitness testimony of questionable reliability, the Supreme Court held that due process "does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." Id. at 730 (emphasis added). What this means in this case is less than clear. On one side of the spectrum we have incidents that are clearly orchestrated by police (a line-up arranged to be intentionally suggestive) and those that are clearly not (a testifying witness running into the defendant in the courthouse hallway before trial). The photo downloading incident seems to fall somewhere in between. It was arranged by law enforcement in the sense that Avilés's colleague asked him to download the pictures, but Avilés's viewing of the photos was really a simple side effect of his performance of an administrative task. Because it is a close call, and in the end we do not think any due process rights were impinged, we will assume that the photo downloading incident qualifies as being arranged by law enforcement and we will go on to consider whether it was unnecessarily suggestive.

That being said, it is likely that these were the photographs Villarubia took of the defendants when they had just arrived in Mayagüez.  These photographs, according to Villarubia's testimony, depicted each defendant against a solid colored wall, photographed from the front and side.  If in fact Avilés downloaded some other photographs of the defendants, it seems a safe assumption that because the photos came from a colleague's camera and Avilés downloaded them at the colleague's request, that the photos had something to do with the defendants' capture and/or arrest and Avilés knew this.  Because the record is insufficiently developed on this issue and we are left to employ guesswork, we simply assume in defendant's favor that some type of unnecessarily suggestive procedure occurred and we proceed to the second step of the analysis.  See De León Quiñones, 588 F.3d at 754 (assuming that a pre-identification encounter where a witness saw the defendant in handcuffs and in the courtroom was impermissibly suggestive); but see Rivera-Rivera, 555 F.3d at 283-84 (finding no impermissibly suggestive episode when a witness, who identified the defendants as the men who robbed him, confirmed for police the identity of the defendants immediately after their arrest, and then saw the defendants, in custody, three or four times after the robbery).

As we said, even when an unnecessarily suggestive procedure preceded the identification, the identification is nonetheless admissible if it is reliable.  See De León-Quiñones,

-24-

588 F.3d at 753. And so we ask whether Avilés's identification of Espinal was reliable. With the factors to be considered and the totality of the circumstances in mind, we answer in the affirmative. Avilés testified that during the drug transfer he "took a look at the guys" and that the boats were so close they collided twice. As the drugs were transferred, Avilés used a pole to keep the two boats close so that they were touching. At the point at which Avilés saw Espinal, a light was turned on and he was able to see Espinal clearly. Avilés, who conceded he only saw two of the four individuals on the boat, unequivocally (in fact, he used the word "undoubtedly") identified Espinal as one of them. The evidence makes clear that Avilés had a good opportunity to view Espinal when the light was turned on, and Avilés had a strong degree of certainty that it was Espinal he saw. The circumstances render the identification reliable. See De León-Quiñones, 588 F.3d at 754-55.

Because of this, suppression of Avilés's identification was not required. As we pointed out, it will be the rare case where identification evidence is not proper fodder for the jury. See id. at 753. This is not that case.

### 2. Hernández's Identification

At trial, Avilés also identified Hernández. He testified that Hernández was the captain of the mothership, the man who was operating the two motors. Like Espinal, Hernández claims his in-

court identification was the product of an impermissibly suggestive pre-trial identification procedure and was unreliable.

Hernández's argument that there was a suggestive pre-trial procedure is a fleeting one that is not bolstered by any developed argument, but we charitably assume that he is referring to the same photo downloading incident as Espinal. For the reasons set forth in the previous section, we again assume that some type of unnecessarily suggestive identification procedure occurred.

As with Espinal though, Hernández's due process claim still fails because Avilés's identification of Hernández was reliable. Again, we conduct our analysis with the relevant factors and totality of the circumstances in mind. Avilés testified that he recalled a light being turned on and seeing the "captain" of the mothership sitting toward the rear of the vessel maneuvering two motors at the same time. Avilés specified that the captain was stationed between the motors with a lever in each hand. He described this sight as "not normal" and "impressive" and identified Hernández as the captain with the impressive skills. Again Avilés's in-court identification was punctuated with certainty as he testified that Hernández was "undoubtedly" the captain of the michera. This evidence leads us to conclude that Avilés had a good opportunity to view Hernández when the light shone on him and indeed Avilés recalled details about Hernández maneuvering the two motors. This detailed recollection "reflects

attentiveness to his surroundings." See Rivera-Rivera, 555 F.3d at 284. Further, as he did with Espinal, Avilés expressed certitude that it was Hernández on the boat. The identification was reliable. Suppression was not required.[17]

### 3. Peguero's Identification

At trial, Villarubia identified Peguero as one of the four arrested men he picked up at Mayagüez. Peguero summarily claims that Villarubia's identification should have been suppressed because it was suggestive and unreliable, and therefore violated his due process rights. However, a close read of Peguero's actual position reveals that he is not in fact arguing that the identification was suggestive or unreliable. Rather, Peguero is contending that because Villarubia's identification of him was based on the pair's on-land encounter, it is not enough to connect him to the on-the-sea drug exchange. Therefore, any due process identification argument is waived for failure to develop it. See Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) (explaining that it "should go without saying that we deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument").

---

[17] Tatis makes an identification argument as well, however Tatis does not argue that any identification of him was problematic. Rather he says that Avilés's identification of an unspecified co-defendant (presumably Espinal or Hernández) was unreliable. This argument, to say nothing of its lack of specificity, gets Tatis nowhere. For the reasons just given, Avilés's identification of both Espinal and Hernández was reliable.

To the extent Peguero is advocating for suppression based on some type of sufficiency argument, a claim which we remind is not preserved, he fares no better. It is within the jury's province to decide whether, given the totality of the evidence produced at trial, there was enough to establish that Peguero was one of the men on the mothership. Suppression of Villarubia's identification testimony, which was just one link in the chain of evidence, clearly was not called for.

## C.  **Prosecutorial Vouching**

During opening statements, the prosecutor spoke about what Avilés was going to testify to at trial. The prosecutor stated:

> Because unbeknownst to defendant Carrero-Hernández and Lassalle-Velázquez, the person that they hire to go there and receive the narcotics was an undercover officer from the Police of Puerto Rico who was working as a task force officer from the Immigration and Customs Enforcement Agency in Mayagüez. He was posing in his undercover capacity as a boat captain. He represented to be someone that was in the business of going out there to get narcotics and introduce it into Puerto Rico. That person is sitting here in court today, is Sergeant Richard Avilés, who is going to testify as to the events that happened in this investigation pretty soon.
>
> . . .
>
> You also are going to hear details about what finally happened the day in which Sergeant Avilés went out there to meet the mothership, get the narcotics, and come back to Puerto Rico . . . The last thing that Sergeant Avilés is going to testify is to what happened on the

-28-

                    25th.  The day he went out, and in fact, was
                    able  to  come  back  with  the  narcotics.
                    (Emphasis added).

As referenced by the prosecutor, Avilés was sitting in the courtroom during opening statements.

On appeal, Tatis and Hernández both claim that the prosecutor improperly vouched for Avilés. Tatis, for his part, argues that the prosecutor suggested Avilés was more likely to be credible because he was an agent of the government. Hernández claims that Avilés's mere presence in court constituted improper vouching. Neither defendant objected to the prosecutor's comment or Avilés's presence and so we review only for plain error. See United States v. Cruz, 156 F.3d 22, 30 (1st Cir. 1998).

"'Improper vouching occurs when the government place[s] the prestige of the United States behind a witness by making personal assurances about the credibility of a witness . . . or implies that the jury should credit the government's evidence simply because the government can be trusted.'" United States v. Gentles, 619 F.3d 75, 83 (1st Cir. 2010) (quoting United States v. Robinson, 473 F.3d 387, 396 (1st Cir. 2007)). If the court determines that improper vouching occurred, we must decide whether the prosecutorial misconduct "so poisoned the well" as to merit a new trial. Id. at 81.

Here the prosecutor did not improperly vouch -- he simply gave the jurors a preview of the evidence that the government

intended to present at trial including a preview of Avilés's testimony, which is consistent with the purpose of opening statements. See United States v. Hershenow, 680 F.2d 847, 857-58 (1st Cir. 1982)(explaining that the "purpose of an opening statement 'is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole'" (quoting United States v. Dinitz, 424 U.S. 600, 612 (1976) (Burger, C.J., concurring))). While the prosecutor did mention Avilés's presence in the courtroom to the jury, he took absolutely no action to imply or suggest that they should credit or elevate Avilés's testimony just because he was a government agent. See Robinson, 473 F.3d at 396 (finding no improper vouching because "the government neither made statements about the witnesses' credibility nor implied that they could be trusted based on their affiliation with the United States"); see also United States v. Pérez-Ruiz, 353 F.3d 1, 10 (1st Cir. 2003) (finding no improper vouching because the prosecutor "neither expressed her personal opinion regarding the veracity of any witness nor implied that [the witness] should be trusted because of some connection to the government"). On this record we find no improper vouching. Because of this we need not embark on a well-poisoning inquiry.

### D.  Trial Judge's Comments

### 1.  Regarding the Evidence

At trial, the items seized from the michera were introduced into evidence.  At a bench conference, the attorneys for Tatis and Peguero challenged the chain of custody of this evidence. In response, the district court judge spontaneously stated: "I have no doubt in my mind that this is the gun, the bullets, and the GPS. And for that reason, I admitted it into evidence.  The evidence is overwhelming to that respect, okay?"  Tatis's counsel responded, "Judge, you speak so loud that the jurors . . . the jurors heard you."  The judge stated, "I'm sorry.  I'm trying not to . . .  Ok. Very well."  The jury was not polled to determine whether any jury member actually heard the comment.  No curative instruction was requested and none was given by the court.

On appeal, Hernández, Tatis, and Espinal all take issue with this comment.  They each make various assertions about why the comment was improper, e.g., the judge usurped the fact finding function of the jury; the judge favored the government's theory of the case; and the comment prejudiced the defendants, poisoned the jury, and impinged on the defendants' right to a fair and impartial trial.  These arguments can best be characterized as allegations of a due process violation based on judicial bias.

When faced with a judicial bias claim, we ask whether the comment was improper and, if so, whether the complaining party can

show serious prejudice.  See United States v. Angulo-Hernandez, 565 F.3d 2, 10 (1st Cir. 2009); see also Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997) ("An inquiry into the judge's conduct of the trial necessarily turns on the question of whether the complaining party can show some serious prejudice.").  When we review for judicial bias, "we consider [] isolated incidents in light of the entire transcript so as to guard against magnification on appeal of instances which were of little importance in their setting." United States v. Ofray-Campos, 534 F.3d 1, 33 (1st Cir. 2008) (internal quotation marks and citation omitted).  Clearly a trial judge should be fair and impartial in her comments during a jury trial because a fair trial in a fair tribunal is a basic requirement of due process.  See United States v. de la Cruz-Paulino, 61 F.3d 986, 997 (1st Cir. 1995).  "However, a finding of partiality should be reached only from an abiding impression left from a reading of the entire record."  Id. (internal quotation marks and citation omitted).

We disagree with the defendants that the judge's comment was improper.  The judge was simply explaining, in response to defense counsel's challenge to the evidence's chain of custody, why she admitted the items into evidence and why she was satisfied there was no chain of custody issue.  The judge's comment was made to the attorneys at the bench; it was not intended for the jury. It is pure speculation that any jury member heard it since the jury

was never polled by the judge sua sponte, or at the request of any defendant.  We see nothing wrong with the comment.

Even assuming that the comment was audible to the jury and this rendered it improper, the defendants cannot show prejudice.  This was a lone, isolated comment about the items seized from the mothership.  It took place on day four of a five day trial.  The judge instructed the jury, both at the beginning and end of the trial, that the case needed to be decided solely on the testimony and exhibits, and that comments by the judge should not be taken by the jury to indicate one way or another what the verdict should be.[18]  A curative instruction addressing this particular incident (and again none was requested) very well could have drawn the jury's attention to something they had actually paid no mind to.  Moreover the evidence did in fact support a finding that those were in fact the items seized from the mothership.  Viewing this one comment in this manner, we see no serious prejudice.

_____

[18] Specifically, at the beginning of the trial, the judge told the jury that they were "going to be the judges of the facts," that "nothing that [the court] may say or . . . do should be taken by [the jury] as indicating what the verdict should be," and that "most importantly, [they] ha[d] to keep an open mind until all the evidence [wa]s in."  At the end of the trial, the judge instructed the jury to "decide the case solely upon the evidence presented," not to "read into" anything the court may have said, to disregard "anything that [the jury] may see or hear" that did not come from the "witness stand and from the exhibits marked in evidence," and not to "draw any inference against" the attorneys because of any admonishments that the court may have given.

## 2. Regarding the Witness

Tatis alone takes issue with additional comments made by the trial judge. These comments occurred during Cancel's testimony when the prosecutor asked Cancel to plot some coordinates on a map. Peguero's counsel objected, stating that the government had not established that Cancel was qualified to plot the coordinates. The judge responded: "He's a licensed pilot. A licensed pilot can do that in two seconds time, so go ahead." Cancel then asked: "Can I say something?" The prosecutor responded: "Sure." Cancel stated: "I'm also a vessel commander." Tatis's counsel interjected complaining that there was no question pending and Cancel was talking up his qualifications. The judge responded: "I'm satisfied that this individual who is here before us, who is a pilot, Customs' pilot, can actually do a plot on that chart. It's as simple as that."

To this court, Tatis claims that the judge improperly commented favorably on the qualifications of a government witness and then allowed that witness to bolster his own testimony. Again we take this to be a judicial bias allegation, and so ask the relevant two questions: were the comments improper and was there serious prejudice. See Angulo-Hernandez, 565 F.3d at 10.

While it is debatable whether the judge's remark that Cancel could plot coordinates "in two seconds time" was an inappropriate commentary not supported by the evidence or just a

-34-

permissible and harmless metaphor, we think the judge's comments overall were relatively benign given that the jury had already heard testimony that Cancel was a pilot.  As we have often said, a "criminal defendant is entitled to a fair trial, not necessarily a perfect one."  United States v. Santiago, 83 F.3d 20, 25 (1st Cir. 1996).  Also we do not agree that the judge improperly allowed Cancel to bolster his testimony.  It was the prosecutor who invited Cancel to speak without a question pending, not the judge.  And we do not think there was any need for curative measures on the judge's part once Cancel's statement about being a vessel commander was made.  Cancel made a statement about what he does for a living, which was relevant to his qualifications to plot coordinates. Striking the statement or admonishing Cancel was not required.  We conclude the judge did not act improperly.  Nor, for the reasons set forth in the previous section (i.e., the isolated nature of the comments and the cautionary instructions given by the court), can Tatis demonstrate serious prejudice.

### E.  Authentication of GPS Evidence

The GPS device that was seized from the mothership was admitted into evidence after being identified by Cabán, the Coast Guard officer who had arrested the defendants on the mothership, and Ramos, the ICE officer who had taken custody of the GPS on land.  José Durand ("Durand"), a Customs forensic scientist who is "in charge of working all evidence that arrives at the lab related

-35-

to portable media," was then called to testify. Durand had retrieved the GPS's data and, employing Garmin (the manufacturer of the GPS) and Google Earth software, had analyzed the GPS's data.

At trial, the GPS's data, in paper and compact disc form, was admitted into evidence. Durand then loaded the data into the Garmin software and onto a computerized map depicting Puerto Rico, the Dominican Republic, and the waters in between. Durand then pointed out and marked on the map the GPS's track points, which revealed where the GPS (and thus the michera) was located at various times during the night of the drug exchange. During this testimony the government showed the jury previously admitted photographs of the michera, which were taken from the air by Cancel. The photographs -- which indicated the coordinates of the photographed area and the time the photograph was taken -- showed that the photographed boat and the GPS were at similar locations at similar times.[19]

Durand then loaded the GPS's data into the Google Earth software, which resulted in a red line that depicted the michera's course during the night in question. He then plotted on the map the coordinates of the boat Cancel was following and marked these with a white arrow. Again the GPS's coordinates and the

_____

[19] For instance, the data revealed that the GPS was at the coordinates 18:45:19 north, 67:58:03 west at 8:00 p.m. One of the photographs taken by Cancel showed the michera at 18:44:26 north, 67:56:51 west at 8:07 p.m. At 9:24 p.m., the GPS was at 18:39:52 north, 67:49:09 west. At 9:25 p.m., the photographed boat was at 18:40:30 north, 67:48:39 west.

coordinates of the photographed boat matched up. Hard copy versions of the marked-up Google Earth maps were admitted into evidence.

On appeal, Espinal argues that (1) the GPS device and (2) the GPS evidence (i.e., the GPS data and the software produced maps with the michera's trajectory) were not properly authenticated and therefore should not have been admitted by the district court. We take each contention in turn.

## 1. GPS Device

With regard to the device itself, Espinal claims that there was nothing to distinguish the GPS that was introduced at trial from any other Garmin GPS on the market, and the GPS's chain of custody was suspect. Espinal did not object to the GPS's admission at trial and so we review for plain error. See United States v. Shoup, 476 F.3d 38, 42 (1st Cir. 2007).

Our inquiry is guided by Federal Rule of Evidence 901, which states that in order to "satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). This does not mean that the proponent must rule out all possibilities inconsistent with authenticity, rather "the standard for authentication, and hence for admissibility, is one of reasonable

likelihood." United States v. Savarese, 686 F.3d 1, 11 (1st Cir. 2012).

Evidence is properly admitted if it is "readily identifiable by a unique feature or other identifying mark." United States v. Luna, 649 F.3d 91, 103 (1st Cir. 2011). If that is not the case, or if the evidence is susceptible to alteration, "a testimonial tracing of the chain of custody" is needed. Id. The time for authenticating evidence is before it is admitted; however, if evidence is admitted prematurely, a new trial is not warranted when later testimony cures the error. See id. at 103-04. We turn to the record evidence.

Prior to the GPS device being admitted into evidence, the following testimony was elicited. Cabán testified that he and his crew seized a GPS from the mothership the night of the interdiction. He then directed Officer Aarón Ríos, a member of his crew, to transfer the GPS from the mothership to the Coast Guard cutter. The boats then headed to Mayagüez -- Cabán and his crew in the mothership and other Coast Guard personnel in the cutter with the GPS and other seized items. When presented with the GPS that the government sought to introduce into evidence, Cabán confirmed that it was the GPS he had seized that night, stating he recognized the GPS based on its "gray front plate" and brand, Garmin.

Ramos also offered testimony about the GPS. Ramos testified that he met up with the Coast Guard officers in Mayagüez

and took custody of the GPS. Ramos prepared a Customs Form 6051 ("Form 6051"), which is a custody receipt used for seized property and evidence. He indicated the GPS's serial number on the form. Another agent then signed for the evidence. The government presented Ramos with Form 6051 at trial and he reviewed it. Ramos was then shown the GPS and asked whether it was the same one he had received from Coast Guard officers that night. He said yes and that he knew this because the serial number on the GPS corresponded with the serial number on the Form 6051. He then read the serial number into the record.

Based on this evidence, we find that the GPS was properly authenticated. Said another way, there is a reasonable likelihood that the GPS was what the government purported it to be. Cabán, the first to come into contact with the GPS, identified it based on its appearance and brand. Ramos identified the GPS by its serial number, which he had recorded when he received the GPS. The testimony of Cabán and Ramos established how the GPS got from the mothership to Ramos. The district court did not commit any error, let alone an obvious one, in admitting the GPS.

## 2. GPS Data and Analysis

As we said, the remainder of Espinal's authentication challenge is aimed at the data generated by the GPS (the hard copy report and CD) and the software produced analysis of this data. His basic contention is that the government did not establish the

accuracy or reliability of the processes employed by the GPS itself or the Garmin and Google Earth software. He also claims that due to the specialized and technical nature of the GPS evidence, expert testimony (as opposed to Durand's lay testimony) was needed to authenticate the evidence. Espinal says that absent such a foundation, the GPS evidence should have been excluded. Espinal did not preserve his objection below and so we review for plain error.[20] See Shoup, 476 F.3d at 42.

Federal Rule of Evidence 901(b)(9), which Espinal relies on, is the provision "typically . . . employed to authenticate data generated by a mechanism." 31 Wright & Gold, Federal Practice and Procedure § 7114 (2012). It provides an illustrative authentication technique, which is that the proponent may offer evidence "describing a process or system and showing that it produces an accurate result." Fed. R. Evid. 901(b)(9). Considering this issue, we have explained that "evidence derived

---

[20] It is clear that Espinal did not object to the admission of the GPS data -- his counsel stated that he did not have an issue with the "information inside" the GPS. Espinal's counsel did however object to the analysis that the software performed of the data, i.e. drawing the michera's trajectory. Counsel vaguely asserted that the software program would effectively be acting as an expert, but did not actually articulate a legal basis for the objection as required by Federal Rule of Evidence 103 (stating that to preserve a claim of error on a decision to admit evidence a party must have "state[d] the specific ground, unless it was apparent from the context"). Because Espinal failed to state a specific ground for his objection, and we cannot glean from the context of his objection that the basis was lack of authentication, his trial objection failed to adequately preserve his claim on appeal. See, e.g., United States v. Vargas, 471 F.3d 255, 264 (1st Cir. 2006).

from the operation of a machine or instrument normally depends for its validity on the premise that the device was in proper working order." United States v. Doyon, 194 F.3d 207, 212 (1st Cir. 1999). A court may however take judicial notice of the foundational facts if the evidence resulted from "a process or system that is generally known and accepted as accurate." 31 Wright & Gold, Federal Practice and Procedure § 7114 (2012).

Here the trial judge did not take judicial notice of any foundational facts but it is clear, based on comments made by the judge, that she viewed GPS technology as commonplace (i.e., "Do you know how many thousands of GPS are in the market today?"; "Every single luxury car has one."; "I have one in my pocket right now.").[21] And the judge distinctly told counsel that she did not think expert testimony was needed with regard to reading and plotting coordinates from the GPS (i.e., "You don't have to be a rocket scientist to read a GPS."; "My nine year old can do that."; "You don't have to be an expert to plot on a nautical map.") While GPS technology is prevalent in our society, we are not convinced that the ability to read and plot coordinates from a GPS is as banal as the district court made it out to be, and we think a better foundation could have been laid for the GPS data and

---

[21] These comments, as well as the next trio of remarks, were made by the trial judge at a bench conference. The subject of the conference was defense counsels' complaint that the government had identified Durand as an expert (though ultimately did not call him as one) but never produced an expert report. More on this dispute later.

-41-

software generated maps. That being said, the district court's decision to admit the evidence, absent more foundational evidence and an expert witness, does not constitute an obvious error. Again we take a look at the evidence.

Prior to the admission of the data, Durand set forth his qualifications. He testified that he has been a forensic scientist with Customs for eight and a half years and has been in charge of "working all the evidence that arrives at the lab related to portable media," including GPS, for a year and a half. Durand had been specially trained with respect to GPS devices and had analyzed ten to twelve GPS devices during his time with Customs.

Durand then testified about the process employed by the GPS device itself. He explained that a GPS "contains data concerning the location of the GPS," and that this location is determined by the GPS hooking up with a satellite, with twenty-seven such satellites currently revolving around the world. He testified that GPS devices typically capture latitude, longitude, days, hours, height, and altitude. Durand explained that he had analyzed the GPS seized from the michera and based on pictures he had taken and the existence of corresponding serial numbers he confirmed that the GPS introduced at trial was the GPS he analyzed. When presented with the hard copy report of the GPS's data, Durand explained it was a report of "the data I collected from the GPS."

The CD, he noted, contained "the GPS digital data" plus "the hard copy" report in digital form.

At this point in Durand's testimony, the GPS data was admitted into evidence. Thereafter he got into more specifics, explaining that a GPS produces way points (user stored information), routes (the coming together of way points), and tracks (a series of non-user created data that is the result of the GPS's connection to a satellite, which shows where the GPS is located). Durand added that elapsed time, the distance traveled, the area covered, and average speed is also recorded on the GPS.

With regard to the process employed by the Garmin software, the following evidence came in. Durand testified that he had Garmin software that could analyze the GPS data contained on the disc. At that point, the Garmin software generated map was published to the jury. Durand then explained that when he selected a particular activity log, which itself contained multiple track points from the GPS, a yellow dot was generated on the computerized map. Durand then walked the jury through the GPS's data, charting the michera's path on the map. At one point during this exercise, Durand was asked about a sixteen-minute gap in the GPS's transmission and he explained that GPS devices can lose communication with satellites for various reasons (e.g., because they are shut off or because of atmospheric conditions).

As for the Google Earth software, Durand confirmed that this software could not only show the data from the GPS but also plot additional coordinates. Durand indicated that he could (and he did) call up the GPS's data with the software. He testified that one could plot specific coordinates, including pre-programmed ones, with the software, which Durand did as well. He further explained that the software produced a red line that indicated the data from the GPS and the additional coordinates (the photograph coordinates) were indicated with a white arrow. Durand went through and plugged in these additional coordinates for the jury. The marked-up maps generated by Google Earth were introduced into evidence. Durand was then asked whether GPS devices have a margin of error and he explained that commercial GPS devices have an intentional margin of error from five to fifteen meters so that they will not be as accurate as those possessed by the government for national security reasons.[22]

The record reveals that Durand offered a good amount of testimony about the processes employed by the GPS, the Garmin software, and the Google Earth software. He was not specifically asked, and did not precisely testify, whether the GPS and the

_____

[22] As the preceding narrative shows some of the authenticating testimony came in before the actual physical exhibits were introduced and some came in after. In instances where evidence is admitted prematurely but is authenticated with later testimony, there is no reversible error. See Luna, 649 F.3d at 103-04. We are not saying that this is what happened here, but for this reason we are not going to differentiate between evidence that came in before and after.

software were in good working order or whether he was confident they produced accurate results.[23]  Nonetheless it is reasonable to infer that Durand would have said that the GPS and software were working fine and turning out accurate results.  He showed no hesitation, and no concerns as to accuracy or reliability, when offering the GPS's data or when plotting it with the software.  Furthermore, he spoke to the reliability of GPS technology in general -- that GPS devices can lose communication with satellites and that commercial GPS devices have an intentional margin of error.  Also the fact that the GPS data and the software plotted courses were consistent with the location of the boat photographed by Cancel underscored the processes' accuracy.  We are satisfied that the GPS data and software generated evidence were adequately, if not extensively, authenticated.

As for Espinal's claim that proper authentication required expert testimony, we do not see things the same way.  There are indeed situations where this court has said that expert testimony is a must.  See, e.g., Hochen v. Bobst Group, Inc., 290 F.3d 446, 451 (1st Cir. 2002) (finding that expert testimony was needed when the nature of a defect, and its causal connection to a printing press explosion, was complicated).  However, this is not one of them.  The issues surrounding the processes employed by the

---

[23] It would have been better practice for the prosecutor to lay such a foundation, but its absence does not mean that the evidence should have been excluded.

GPS and software, and their accuracy, were not so scientifically or technologically grounded that expert testimony was required to authenticate the evidence, and thus the testimony of Durand, someone knowledgeable, trained, and experienced in analyzing GPS devices, was sufficient to authenticate the GPS data and software generated evidence. See, e.g., United States v. Thompson, 393 F.App'x. 852, 858-59 (3d Cir. 2010) (finding that a lay witness's testimony concerning the operation of a GPS device, including authentication of the GPS's data, was properly allowed by the trial court).

Given Durand's testimony about the processes employed by both the GPS and the software, his lack of reservation as to the data, his confident use of the software, the fact that a serial number comparison confirmed that the GPS Durand analyzed was the same one confiscated by Ramos, and the fact that the coordinates from the GPS and Cancel's photographs were similar, we find that the reasonable likelihood standard for authentication of the data and software generated maps was satisfied. See Asociación de Periodistas de Puerto Rico v. Mueller, 680 F.3d 70, 79 (1st Cir. 2012) ("so long as the evidence is sufficient to allow a reasonable person to believe the evidence is what it purports to be, it is left to the fact finder to determine what weight it deserves") (internal quotation marks and citation omitted). The trial judge did not commit an obvious error by admitting the evidence.

## F. Rule 16 Expert Disclosure

Prior to trial Durand was identified by the government as an expert witness. Along with his curriculum vitae, a summary of Durand's anticipated testimony was provided, though nothing detailing what opinions he might offer. During Durand's testimony, defense counsel requested a sidebar. Various objections were raised, the pertinent one being advanced by Tatis's counsel who objected because the government had not provided an expert report. The prosecutor referred counsel to the summary of Durand's anticipated testimony that had been provided. The court said the summary was sufficient; the disclosure did not need to be in report form. The prosecutor added that he had only identified Durand as an expert out of "an abundance of caution" but that he would not be testifying as such. The trial judge agreed with this approach and Durand was never qualified as an expert or presented to the jury as an expert.

On appeal Peguero and Hernández (in verbatim arguments) contend[24] that the district court abused its discretion by allowing Durand, whom they characterize as an expert witness, to testify without the government having provided a written summary of his opinions in accordance with Federal Rule of Criminal Procedure

---

[24] Tatis and Espinal allude to Durand not providing an expert report in their briefs, but offer no precise argument.

16(a)(1)(G).[25]  The government counters that Durand did not testify as an expert and so there is no Rule 16 issue.

Whether Peguero and Hernández preserved this claim on appeal is up for debate.  It was Tatis's counsel that brought the Rule 16 issue to the court's attention but even that objection (that the disclosure was not in report form) and the one before us (that the disclosure did not include Durand's opinions) are not really the same.  During the sidebar colloquy Hernández's attorney did try to argue something about Durand not being qualified as an expert but he was cut off by Tatis's attorney.  Peguero's attorney said nothing.  Because there was a lot of back and forth and interrupting, it is hard to tell who was arguing what.  Therefore, we will treat the objection as preserved making abuse of discretion the standard to meet.  See United States v. Hilario-Hilario, 529 F.3d 65, 71-72 (1st Cir. 2008).  Plus in the end it does not matter; defendants cannot succeed even under this more friendly standard.

"There is no bright-line rule to separate lay opinion and expert witness testimony" and decisions considering this issue are often in tension.  Id. at 72.  The problem we typically see is that a witness "may be qualified to provide both lay and expert

---

[25] The rule requires the government "give to the defendant a written summary" of any expert testimony that "the government intends to use."  Fed. R. Crim. P. 16(a)(1)(G).  That summary "must describe the witnesses's opinions, the bases and reasons for those opinions, and the witness's qualifications."  Id.

testimony in a single case." Id. (internal quotation marks and citation omitted). It is arguable that portions of Durand's testimony, such as his explaining how GPS technology works and his plotting of the GPS data, reflected a "specialized knowledge and . . . heightened sophistication normally associated with expert testimony." Id. But we sidestep this thorny issue because even supposing that Durand's testimony straddled or crossed the line into expert testimony, defendants cannot prevail.

To obtain a reversal based on a Rule 16 claim, a defendant has to show prejudice. See id.; see also United States v. Rosario-Peralta, 199 F.3d 552, 559 (1st Cir. 1999). Neither Peguero nor Hernández have even attempted to make this critical showing. And we do not think they could have. The government provided a summary of Durand's expected testimony, which mirrored his eventual testimony. Namely that Durand would (as the disclosure read) "testify as to the route, tracks, way-points and coordinates which the vessel carrying defendants . . . was at different hours during the night of January 25, 2008 and the time surrounding the drug smuggling venture." The government did not, in accordance with Rule 16, state what opinions Durand was expected to offer at trial but this is not particularly concerning given that Durand did not ultimately offer opinion testimony.[26] Rather

---

[26] The only opinion-like testimony was mentioned earlier in this decision. Durand was asked why there was a sixteen-minute gap in the GPS's transmission. He could not say for sure but explained that these gaps happen for various reasons when the GPS loses

-49-

he used the GPS data to track the michera's path, just like the disclosure said.  Further, defendants were given the opportunity to consult with an expert to discuss this GPS data prior to trial (more to follow on this).

In light of the above, there was no prejudice to Peguero or Hernández.  They had sufficient information before them to prepare for Durand's testimony and to cross-examine him.  The Rule 16 claim falls flat.  The court did not abuse its discretion in allowing Durand to testify without requiring more of a disclosure from the government.

## G. Request for a Continuance

Durand was the government's final witness and he testified on day four of trial, a Friday.  At the conclusion of his testimony, around 5:30 p.m., a bench conference was held at which Espinal's attorney requested a continuance so that defense counsel "could have a couple of hours" to discuss Durand's testimony with an expert.  The trial judge responded: "No.  The motion is denied, and you're going to do the cross right now.  I have another trial on Monday, and we haven't finished this one yet."  No one objected and defense counsel went ahead with their cross of Durand. Hernández's attorney asked one question and Espinal's attorney asked a few.  Counsel for Tatis and Peguero did not ask any.

communication with the satellites.  Assuming this was an opinion, this one statement is not enough to tip the prejudice scales.

On appeal, Espinal and Tatis argue that the district court erred when it denied the continuance request.[27] They say the denial hindered their ability to mount a defense and properly cross-examine Durand, implicating their right to confront witnesses and to meaningful assistance of counsel.

We review a district court's decision to deny a continuance for an abuse of discretion. See United States v. Correa-Alicea, 585 F.3d 484, 491 (1st Cir. 2009). Relevant factors meriting consideration are the reason for the request, the amount of time needed, the complexity of the case, the extent of inconvenience to others if the request is granted, and the likelihood of injustice or prejudice resulting from the denial. See United States v. Williams, 630 F.3d 44, 48 (1st Cir. 2010). To establish abuse the aggrieved party must show "that the court exhibited an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." Id. (internal quotation marks and citation omitted). It is

[27] In a related argument, Peguero claims that the district court also wrongfully denied the defendants' request, which came the following Monday, to have a maritime expert testify for the defense. We need not get into the particulars of the request or the court's denial of it. It suffices to note that although Peguero recites the relevant facts, the sum total of his argument is that the court committed an abuse of discretion by not allowing the defendants to present an expert witness. No analysis or legal citations undergird this assertion. We decline to address such an underdeveloped argument. See Colón, 358 F.3d at 5-6 (explaining that "it is not this court's role to assemble a coherent argument for one side merely because evidentiary pieces are mentioned somewhere among the factual recitations and the topic sentence of the argument is supplied").

essential that prejudice from the ruling be identified.  See id.
Defendants have not made this showing.

The request here was for consultation with an expert to discuss Durand's testimony pertaining to the GPS reading and mapping.  The subject matter, though detailed and technical, was not overly complex.  As for the amount of time the defendants needed; they did not specify.  But given that the request came at the end of the day on a Friday, we do not think it would have caused a great inconvenience for the judge to have granted the continuance and for Durand's cross-examination to have gone forward on Monday, particularly since it was clear the trial would continue into the next week.  That being said, district courts "enjoy broad discretion in managing their dockets," and the judge indicated that she had another trial starting up.  Delgado v. Pawtucket Police Dep't., 668 F.3d 42, 50 (1st Cir. 2012).

While a defendant's right to present a defense cannot be sacrificed to achieve expeditious docket management, we do not think that is what happened here.  The defendants have not established that the judge's denial was unreasonable and arbitrary and significantly, the critical prejudice showing is missing.  At a status conference five days prior to the start of trial, the defendants requested funds so that they could consult with an expert, Captain José Rivera, with whom they wanted to go over the GPS evidence.  The judge approved a consultation for up to five

hours.  At this time, the defendants had already received the GPS evidence from the government.  They also had a summary of Durand's expected testimony, which as we said in the previous discussion, matched up with the testimony he gave.  Because of this Espinal and Tatis had adequate time before trial to consult with an expert, and they had sufficient information to make that consultation meaningful.  The trial judge is not to be faulted for not allowing them to take a second crack at it.  The court did not commit an abuse of discretion in denying the continuance request.

## H. Voir Dire of Cabán

During Cabán's testimony the 9 mm gun, ammunition clip, and GPS were admitted into evidence.  Peguero's attorney requested that defense counsel be allowed to cross-examine and voir dire Cabán regarding the evidence.  The judge said yes to cross-examination but no to voir dire, stating that cross-examination was sufficient as the issue was one of weight as opposed to admissibility.

To this court, Hernández argues that the court's denial of voir dire violated his right to a just and fair trial and to present a defense.  He does not flesh this argument out, offering no explanation as to how the denial negatively affected him or why the cross-examination allowed by the court was not adequate.  As we have said, a "litigant has an obligation to spell out its arguments squarely and distinctly or else forever hold its peace."  United

States v. Zannino 895 F.2d 1, 17 (1st Cir. 1990) (internal quotation marks and citation omitted).  That is all we need to say on this issue.

### I. **Brady** Violation

As alluded to in our narrative of the goings-on at trial, a video taken by Cancel with the plane's camera was introduced into evidence.  Cancel had downloaded the video from the plane's digital video recorder ("DVR"), which is a hard drive-like device that had stored the video.  He then transferred the video to a DVD disc.  The DVD video was played for the jury and introduced into evidence.

The video started at 9:47 p.m., approximately twenty-seven minutes after the drug exchange had been completed.  The video showed the michera traveling through the water, it being intercepted by the Coast Guard, and the defendants' arrests.  It did not show the beginning of the mission, namely the michera's approach to the UC boat, the two boats floating in tandem, and the actual unloading of the drugs.  Cancel, during his testimony, explained to the jury that this was because when he attempted to download the beginning portion of the video, a DVR failure occurred and that portion of the video was lost.[28]

Espinal sought to examine the DVR prior to trial, but his request was denied by the court.  On appeal, Tatis argues that the

---

[28] As we mentioned before the plane actually had two DVRs, however, one of them was not functioning properly from the beginning of the mission and so the crew was not using that DVR.

government's failure to turn over the DVR constituted a Brady violation. See Brady v. Maryland, 373 U.S. 83 (1963). He contends that he needed to inspect the DVR because the lost video (assuming he could extract it) could provide evidence of other boats in the area of the UC boat. Such video, he says, would be helpful support for the defendants' mistaken-boat theory.

We start by outlining the particulars of the request for the DVR. In its pretrial scheduling order, issued March 12, 2008, the court (among other things) ordered the government to turn over all Rule 16 discovery, including all information and material that might be favorable to the defendants within the scope of Brady. The government turned over some initial discovery. Not satisfied with what he received, Espinal (who is not alleging a Brady violation on appeal) filed two motions requesting that the government produce the videos taken by the aircraft. The government filed a response saying that due to a technical malfunction they were unable to recover any video from the aircraft. It provided a letter from Avalex Technology, the DVR's manufacturer whom the government had engaged to repair the DVR and recover the video, which indicated that Avalex's efforts at retrieval had been unsuccessful. Espinal responded by filing a motion in which he made various discovery demands, including (most pertinent to our inquiry) asking the court to order the government to allow him to inspect the DVR so that an expert could be engaged

-55-

to try and retrieve the lost video. Espinal did not specifically invoke Brady in his request to inspect the DVR though he did in another portion of the motion when he requested audio recordings of the conversations between the aircraft crew.

In the meantime, the government received word that Customs did in fact have a video recording depicting part of the night's events on DVD (the DVD that was ultimately introduced at trial). The DVD was turned over to the defendants. Because of this, the district court denied Espinal's motions seeking discovery of the videos as moot. The court never ruled on the motion in which Espinal requested to inspect the DVR and so a month later Espinal filed another motion reiterating his request. The court responded this time, denying the motion in an electronic order. The court did not elaborate on its reasoning other than to say that based on the parties's submissions it was denying the motion. Espinal requested reconsideration and was denied.

Nearly a year later, and a month before trial, Tatis (who, to refresh the reader's recollection, had not requested to inspect the DVR but who is pursuing the Brady issue on appeal) filed a motion in limine. Tatis sought to prevent the government from offering the DVD video taken by Cancel into evidence arguing that it would be prejudicial and confusing to the jury because it was not the complete recording of the evening's events. Tatis also referenced the court's denial of Espinal's request to inspect the

DVR, noting that the defendants had no way of verifying the technical malfunction. The court denied the motion in limine.

The essential elements of a <u>Brady</u> claim are: the evidence at issue must be favorable to the accused either because it is exculpatory or impeaching; the evidence must have been willfully or inadvertently suppressed by the government; and prejudice must have ensued. See <u>United States</u> v. <u>Avilés-Colón</u>, 536 F.3d 1, 19 (1st Cir. 2008). "The government is primarily responsible for deciding what evidence it must disclose to the defendant under <u>Brady</u>." <u>United States</u> v. <u>Prochilo</u>, 629 F.3d 264, 268 (1st Cir. 2011). In a situation where a defendant has made only a general request for <u>Brady</u> material, the government's decision about that disclosure is ordinarily final (unless later events reveal that exculpatory evidence was not disclosed). See <u>id.</u>; see also <u>Pennsylvania</u> v. <u>Ritchie</u>, 480 U.S. 39, 59 (1987). It is at this point where Tatis's <u>Brady</u> claim first flounders.

There is no indication in the record that Tatis ever requested to inspect the DVR, let alone alleged that it might contain exculpatory material that he was entitled to under <u>Brady</u>. His co-defendant Espinal did file a motion asking the court to order inspection of the DVR (Tatis mentions this in his motion in limine), but Espinal's motion did not contain an allegation that the DVR evidence might exonerate. That leaves us with the court's scheduling order, which contains a general command for the

government to turn over all potentially exculpatory material under Brady. With only this general dictate, we think the government's decision as to what was and was not potentially exculpatory, and its decision not to turn over the DVR, should stand. See Prochilo, 629 F.3d at 268.

But we will assume otherwise for the sake of argument and turn our attention to the Brady elements. Our inquiry starts and ends with the first. To establish a Brady violation a defendant must provide the court with at least "some indication" that the materials he seeks to access contain material and potentially exculpatory evidence. United States v. DeCologero, 530 F.3d 36, 64-65 (1st Cir. 2008); see also United States v. Brandon, 17 F.3d 409, 456 (1st Cir. 1994). Tatis has not done this.

Assuming Tatis would have been able to do what the DVR's own manufacturer could not do and extract the lost video, there is absolutely no indication that the video would contain potentially helpful evidence of other boats in the area. In fact all indications are to the contrary. Cancel testified no less than six times that there were only five boats in the area. He said there was the UC boat and the michera, which are both small boats, and three large boats, which were ruled out because they were large. This testimony was not equivocal -- Cancel stated that "within 32 miles range there was no other boat other than the three [large] boats I talked to you about earlier, and the UC boat and the

michera."  There was no evidence that contradicted this testimony. Tatis's claim that there might have been more than these five boats in the area is nothing short of pure speculation.  His optimistic expectation that the lost video might reveal this is also a shot in the dark.  Brady did not create a "general constitutional right to discovery in a criminal case."  Weatherford v. Busey, 429 U.S. 545, 559 (1977).  We decline Tatis's invitation to hold otherwise. Because Tatis has provided us with no indication that the DVR evidence is material and potentially exculpatory, there is no Brady violation.

## J. Sentencing

Both Espinal and Hernández claim that their sentences are unreasonable and that the district court made various errors in connection with sentencing.  "We typically examine sentencing decisions for abuse of discretion, which is really a review for reasonableness."  United States v. Denson, 689 F.3d 21, 26 (1st Cir. 2012).  The two aspects of reasonableness are procedural and substantive.  See id.  Both are implicated here as the defendants make procedural-type claims, e.g., the court improperly calculated the Sentencing Guidelines ("Guidelines") range and inadequately explained the sentence, and substantive-type claims, e.g., the sentence is unreasonably long.  See Gall v. United States, 552 U.S. 38, 51 (2007).  We start with Espinal's claims.

## 1.  Espinal's Sentence

Espinal was sentenced to twenty-four years in prison -- the lowest possible sentence in his applicable Guidelines range. He cries foul, arguing that the district court should have reduced his base offense level because he was a minimal participant in the crime; that the court's explanation for the sentence imposed was inadequate; and the sentence was unreasonably harsh. We start with his minimal participant argument.

Espinal says his base offense level should be adjusted downward four points because he played a small role in the drug venture.  He characterizes himself as a seaman turned mere courier, and the real masterminds of the crime as big time underworld bosses.  The burden is on Espinal to show that he was a minimal participant.  See United States v. Santos, 357 F.3d 136, 142 (1st Cir. 2004).  To qualify as such, a defendant must prove that he is "substantially less culpable than his cohorts in the actual offense and that he is substantially less culpable than the vast majority of those taking part in similar crimes." Id.  In short, Espinal must be a plainly peripheral player.  See id.  He has not shown us that this is the case.

Though Espinal may not have orchestrated the drug deal, like his co-defendants who pled out, or driven the michera, like Hernández, he has not established that he was any less culpable than his fellow so-called couriers, Peguero and Tatis.  In fact,

Espinal was the only one that Avilés could affirmatively identify as passing him the kilos of cocaine. Further, even if Espinal was just a mere courier, this does not automatically entitle him to minimal role reduction. See id. at 143; see also United States v. Paz Uribe, 891 F.2d 396, 399 (1st Cir. 1989). Not to mention the fact that there was a very large amount of drugs involved here.[29] This alone "militates against a finding that his role was minimal." Santos, 357 F.3d at 143. As we have said, it is a "rare case in which a defendant will warrant designation as a minimal participant." Id. at 142. Espinal has not met his burden of showing that this is one of those cases.

Espinal next says the court did not adequately explain the rationale behind the sentence. Pursuant to 18 U.S.C. § 3553(c), the district court "shall state in open court the reasons for its imposition of the particular sentence." Here the judge's explanation was by no means lengthy but she did explain that the sentence was based on the kind and amount of drugs involved, the presence of the gun, and the fact that, in the judge's view, none of the defendants played a minimal role due to the large amount of drugs involved.[30] The judge did not get into Espinal's pre-sentence

---

[29] According to the testimony, the quantity was about 400 kilograms of cocaine, one of the largest amounts that one Puerto Rico police officer had ever seen seized. The amount the defendants were ultimately convicted of was 418 kilograms.

[30] The judge expressed the same sentiment at Hernández's sentencing -- "Counsel, when you embark with an adventure of this nature with 418 kilos of cocaine, nobody plays a minor role in that

-61-

memorandum contention that his imprisonment would cause extreme hardship to his sick mother that he cares for. Nonetheless we think the court's explanation was sufficient. As we have said, brevity and inattention are not the same things and this is especially so when the imposed sentence falls within the Guidelines range. See United States v. Dávila-González, 595 F.3d 42, 48 (1st Cir. 2010); see also Rita v. United States, 551 U.S. 338, 356-57 (2007) (finding that "when a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation"). Here Espinal received the lowest possible sentence in his Guidelines range. The court's explanation was sufficient. See, e.g., Dávila-González, 595 F.3d at 48 ("Although it is true that the district court did not explicitly address each of the appellant's arguments for a below-the-range sentence, the court was not required to offer that level of elucidation.").

Finally Espinal argues that a twenty-four year sentence was too harsh given that he was a first time offender with no drug-use history and that he resides with, and provides for, his sick mother, common-law wife, and son. He says the sentence violated the parsimony principle -- "the statutory directive that sentences should be no higher than necessary to achieve the statutory goals of sentencing." United States v. Turbides-Leonardo, 468 F.3d 34,

---

boat. Nobody."

41 (1st Cir. 2006); see 18 U.S.C. § 3553(a). The substantive reasonableness of a sentence "depends largely on whether the sentence imposed represents a defensible result supported by a plausible rationale." Denson, 689 F.3d at 27. The sentence here is grounded in a plausible rationale. Espinal participated in a conspiracy to import a very significant amount of drugs -- 418 kilos of cocaine -- into Puerto Rico. He was part of the team that brought those drugs over, and was the individual, or at least one of the individuals, who handed the drugs over to Avilés. Espinal's sentence, which is at the absolute bottom on the Guidelines range, is defensible. See Turbides-Leonardo, 468 F.3d at 41 (stating that it "will be the rare case in which a within-the-range sentence can be found to transgress the parsimony principle").

We find no abuse of discretion here. Espinal's sentence was procedurally sound and substantively reasonable.

### 2. Hernández's Sentence

Hernández, who like Espinal received the lowest possible sentence in his applicable Guidelines range, was sentenced to thirty years in prison. He argues that his sentence was unreasonable and the court relied on two impermissible factors when it sentenced him: a crime Hernández committed when he was eighteen and the general havoc and societal ills caused by drugs. He adds that the court was reluctant to consider mitigating factors. We take his claims in order.

Hernández, who was forty years old at the time of trial, had three prior convictions, all of which were listed on his pre-sentence report: alien smuggling at the age of eighteen; illegal re-entry at the age of nineteen; and more alien smuggling at the age of twenty-three.  The probation officer had originally used all three crimes to calculate Hernández's criminal history category; however, the probation officer determined before sentencing that the crimes committed when Hernández was eighteen and nineteen should not be considered.  The judge was advised of this, and at Hernández's sentencing explicitly stated that these two crimes were not being considered.  Thus the record makes clear that the court did not rely on the very thing that Hernández accuses it of improperly relying on.  No more need be said.

We can also make quick work of contention two.  Hernández says that the judge relied "entirely" on the "general havoc and social problems caused by drugs" when deciding his sentence.  This is not an accurate characterization of what happened.  In response to defense counsel arguing that Hernández deserved lenient treatment, the judge referenced the "major havoc and social problems" that the distribution of 418 kilos of cocaine -- the specific amount Hernández was convicted of transporting -- would cause.  The judge was not referring to some generalized impact of drugs on society; she was referring to the specific impact of Hernández's crime.  It is also clear that Hernández's sentence was

not based, as he alleges, "entirely" on this consideration. When explaining the sentence the judge cited the amount of drugs, the fact that a weapon was on board the boat, and the fact that Hernández was the captain of the michera.

Hernández's hazy recollection of the record aside, there is no merit to his argument. The impact of a defendant's crimes on society is a proper consideration for a sentencing court. See, e.g., United States v. Pulido, 566 F.3d 52, 64 (1st Cir. 2009) (finding no error where the district court emphasized the danger that defendant's crimes posed to society); United States v. Gilman, 478 F.3d 440, 447-48 (1st Cir. 2007) (affirming a sentence based in part on the court's consideration of the harm caused to society by defendant's conduct). It was not an abuse of discretion for the court to rely on this factor.

Hernández's final argument fares no better. He faults the court's supposed reluctance to consider unspecified mitigating factors. We assume Hernández to be referring to the arguments he made at sentencing; that he was a minor participant and had not been convicted of a crime in seventeen years. The record reveals that the court did in fact consider these factors and found them outweighed by other considerations, most especially the very large amount of drugs involved. The court's decision to weigh more heavily the seriousness of the offense rather than any mitigating factors was well within its discretion. See United States v.

<u>Zapata</u>, 589 F.3d 475, 488 (1st Cir. 2009) (stating that the "court's decision to emphasize the nature of the crime over the mitigating factors was a choice of emphasis that is not a basis for a founded claim of sentencing error") (internal quotation marks and citation omitted).

Hernández avers that the end result of these supposed errors was an unreasonable sentence. We disagree. As there was with Espinal, there is a plausible rationale for the sentence handed down. Hernández participated in a conspiracy to import a very large amount of drugs. He was the captain of the boat that brought those drugs over. His sentence, also at the absolute bottom of the Guidelines range, is defensible.

Again, the district court did not abuse its discretion. Hernández's sentence was procedurally and substantively reasonable.

### K. Cumulative Error

Espinal argues that the cumulative effect of the respective errors he alleged require reversal. Because we did not find merit in any of his individual complaints, it of course follows that there was no reverse-worthy cumulative error. <u>See</u> <u>United States</u> v. <u>Brown</u>, 669 F.3d 10, 28 (1st Cir. 2012).

### III. CONCLUSION

After thorough consideration, we find no merit to any of the defendants' claims of error. The convictions and sentences of all four defendants are affirmed.