# United States Court of Appeals
## For the First Circuit

No. 15-1649

UNITED STATES OF AMERICA,

Appellee,

v.

FRITZ BLANCHARD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Torruella, Lynch, and Barron,
Circuit Judges.

Mary A. Davis, with whom Tisdale & Davis, P.A. was on brief, for appellant.

Margaret D. McGaughey, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for appellee.

August 8, 2017

**TORRUELLA**, **Circuit Judge**.   Following a jury trial in the United States District Court for the District of Maine, Fritz Blanchard was convicted of one count of aiding and abetting the interstate transportation of three victims for purposes of prostitution, in violation of 18 U.S.C. §§ 2421 and 2422.   On appeal, Blanchard argues that the court erred by allowing unauthenticated exhibits into evidence and that he was denied a fair trial because information concerning similar bad acts was presented to the jury via cross-examination when he took the witness stand on his own behalf.   Blanchard also submitted a pro se supplemental brief that raises sufficiency of the evidence and inadequate jury instruction claims as well as challenges the district court's denial of a motion for a mistrial.   Unpersuaded by these arguments, we affirm.

## I.  Background[1]

In March of 2013, Blanchard joined his childhood friend Samuel Gravely and Gravely's romantic partner, Alisha Philbrook, on a trip to Bangor, Maine.   Philbrook and Gravely had previously agreed to begin prostituting Philbrook.   Gravely (a cooperating witness who had already pled guilty to transportation in interstate

---

[1]  "We rehearse the pertinent facts in the light most agreeable to the verdict, deferring some details to our analysis of the issues raised on appeal."  United States v. Savarese, 686 F.3d 1, 5 (1st Cir. 2012) (citation omitted).

-2-

commerce for purposes of prostitution at the time of Blanchard's trial) testified that Blanchard was the one who suggested prostitution to him as a means of making money and that prior to March 2013 Blanchard was himself already profiting from prostitution. On March 13, 2013, Gravely, Philbrook, and Blanchard drove to Bangor, Maine, where Gravely rented a room in a Motel 6. There, Gravely took Philbrook's picture and, with Blanchard's help, posted an ad on Backpage.com ("Backpage"), a website often used to advertise escort services. Cf. Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 16-17 (1st Cir. 2016). Between March 13 and 14, Philbrook saw clients in the hotel room while Gravely and Blanchard waited in the parking lot. She gave all the money she earned to Gravely. Afterwards the three returned to Presque Isle, Maine, where they were living.

On March 25, the trio returned to Bangor, Maine and Philbrook again made money from prostitution, which she gave to Gravely. On March 26, deciding that business in Bangor was slow, the three traveled together to Portland, Maine. On March 27 they rented a room at a Travelodge in Portland, where Philbrook saw customers.

At some point while in Portland, Gravely and Blanchard went out to get food and met a female minor only identified on the record as M.J. Gravely, Blanchard, and M.J. went back to the

Travelodge where Blanchard took pictures of M.J. and posted another ad on Backpage. Gravely testified that M.J. began seeing customers with Blanchard's coaching on how to talk to them on the phone and how much money to charge. M.J. saw clients at the Travelodge while Gravely, Blanchard and Philbrook waited in the car.

Sometime between the evening of March 27 and the morning of March 28 the group decided to travel to Boston, Massachusetts.[2] Before they left, however, Gravely and Blanchard met a woman named Kaylee Howland and invited her to go along with the four of them to Boston. Howland agreed and the three returned to the Travelodge to pick up Philbrook and M.J.

Gravely drove the group to Boston. On the way there, Blanchard booked and paid for a room at the Midtown Motel in Boston. Howland testified that during this trip Philbrook and M.J. used an iPad to look at a webpage that she later recognized was Backpage. When they arrived in Boston, Gravely and Blanchard dropped the women off at the hotel and the two of them continued

---

[2] There was conflicting testimony given as to the reason for this trip. Gravely testified that they decided to travel to Boston because business was slow in Portland. Philbrook testified that the purpose of the trip was actually to go to Miami to pick up a woman who had made money for Gravely as a prostitute and that Boston was merely a stopping over point. Blanchard testified that Gravely was going on a trip and he merely hitched a ride to Boston.

-4-

to Blanchard's mother's home in Dorchester. There, they tried to post another ad on Backpage for M.J. and Philbrook, but they did not have a credit card to pay for it.

Unsuccessful in their attempt to advertise the women on Backpage, Gravely and Blanchard returned to the hotel. Blanchard wanted to walk "the track," an area in Boston where prostitutes walk the streets. Gravely dropped Howland, Philbrook, and Blanchard off in the area of the track. Philbrook testified that Blanchard told her to show Howland "how to do it, to walk around and get in a vehicle and show her how to proceed." Philbrook testified that she did not do this, at which point Blanchard himself began talking to Howland. Howland testified that Blanchard told her to watch Philbrook and gave her tips on how to be an escort. After some time she told Blanchard she was sick as a pretext because she wanted to return to the hotel.

Gravely returned to pick up the trio. They all went back to the hotel room and Blanchard left with M.J. Howland told Philbrook that she wanted to return to Maine. She got her belongings and went to the front desk. Howland, in tears, told the front desk staff that she wanted to go home. The hotel staff put her in a back room where she spoke to the head of hotel security who then called the police. When the police arrived they went up to the room rented by Blanchard. Gravely was permitted to leave

but Philbrook, Howland and M.J. were taken by the police to the police station. Gravely found Blanchard and the pair returned to Maine.

Blanchard was subsequently convicted of aiding and abetting the interstate transportation of three victims for purposes of prostitution, in violation of 18 U.S.C. §§ 2421 and 2422, and sentenced to 46 months of imprisonment.

## II. <u>Authentication of Evidence</u>

On appeal, Blanchard argues that the Backpage ads of Philbrook and M.J. were not properly authenticated, that they therefore should not have been admitted, and that he was prejudiced by their admission. As part of this argument he asserts that the government should have submitted expert testimony from Backpage explaining discrepancies between the ads the government sought to admit into evidence and the testimony of the government's authenticating witness, Gravely. To authenticate evidence "the proponent must produce evidence sufficient to support a finding that the item is what its proponent claims it is." Fed. R. Evid. 901(a). Blanchard asserts that the ads were not what the government purported them to be because key features -- namely, the date and place of creation -- differed from the testimony of the authenticating witness. The district court admitted the two Backpage ads over Blanchard's objections, asserting that any

discrepancies between the ads themselves and the testimony about them "goes to the weight and not the admissibility."

It is axiomatic that documentary evidence must be authentic. United States v. Holmquist, 36 F.3d 154, 167 (1st Cir. 1994) ("It cannot be gainsaid that documentary evidence must be authentic."); United States v. Paulino, 13 F.3d 20, 23 (1st Cir. 1994) (stating that documentary evidence must be authentic and that authenticity is a condition precedent to admissibility). Authenticity is closely related to relevance, for if an item is not what it purports to be then it may not be relevant to the inquiry. See United States v. Browne, 834 F.3d 403, 409 (3d Cir. 2016) (starting inquiry into authenticity by first examining relevance).

Evidence of authenticity may consist of "direct testimony of either a custodian or a percipient witness." Paulino, 13 F.3d at 23; see also Fed. R. Evid. 901(b)(1). This evidence is extrinsic to the document or item itself. See, e.g., United States v. Appolon, 715 F.3d 362, 371-72 (1st Cir. 2013) (employee could authenticate files because she updated and maintained them); United States v. Landrón-Class, 696 F.3d 62, 69 (1st Cir. 2012) (doctor authenticated prescriptions he made himself). It can also come from elements of the document itself, such as "[t]he appearance, contents, substance, internal patterns,

or other distinctive characteristics of the item, taken together with all the circumstances."  Fed. R. Evid. 901(b)(4);  see also Paulino, 13 F.3d at 23.

The standard the district court must apply in evaluating a document's authenticity is whether there is "enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be."  Paulino, 13 F.3d at 23. This standard does "not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity." Holmquist, 36 F.3d at 168.  "Because rulings of this stripe involve the exercise of the district court's sound discretion, we review them only for mistake of law or abuse of that discretion," Paulino, 13 F.3d at 23, unless the ruling was unobjected-to below, in which case we review for plain error, Savarese, 686 F.3d at 12.

Mindful of these precepts, we turn to the ads in question.  The government first mentioned the ads in its opening statement when it told the jury that "[y]ou'll see the ad that they posted for Alisha Philbrook," and, with regards to M.J., "[y]ou'll see the ads they posted."  Thus, in the beginning the government claimed that it would introduce the actual ads posted on March 13 in Bangor, Maine and March 27 in Portland, Maine ("the Original ads").

Ultimately the government introduced two documents purporting to be these ads. Government's Exhibit 1 ("Exhibit 1") was a Backpage ad for Philbrook that was admitted during Gravely's testimony. Gravely identified the exhibit as an ad that Blanchard helped him to prepare and post on March 13 in Bangor, Maine. He stated that he took the pictures for the ad at the Motel 6 in Bangor, after which Blanchard showed him how to post them in an ad on Backpage. Defense counsel objected to admission of the ad because, although Gravely testified that it was created and posted on March 13 in Bangor, Maine, the actual ad the government sought to admit into evidence contained information from Backpage indicating that it was created on March 23 and posted on March 27 in Portland, Maine.[3] In sidebar the government's attorney stated that the government had subpoenaed records from Backpage and that Exhibit 1 is the ad that they received. The government's attorney told the trial judge that Backpage had explained that "when an ad is posted more than one time they don't keep every single iteration

_____

[3] The government argues that Blanchard did not preserve an objection to the authenticity of Exhibit 1. At trial, Blanchard's attorney objected when the government sought to introduce Exhibit 1, pointing to the same discrepancies between Gravely's testimony and the document itself that he now raises before us. "[O]bjections to evidentiary proffers must be reasonably specific in order to preserve a right to appellate review." Holmquist, 36 F.3d at 168. Blanchard's arguments that there were discrepancies between Gravely's testimony and Exhibit 1 are adequate to preserve his objection.

of the ad."[4]  The government further argued that Exhibit 1 is relevant because it demonstrated that Philbrook was working as a prostitute in Maine prior to the trip to Boston and that Blanchard facilitated that work by helping post the ad.  The government, the proponent of the exhibit, therefore appears to have modified the claim made in its opening statement and ultimately argued that Exhibit 1 was a Backpage ad created and posted in Maine prior to the trip to Boston.  Accepting this argument, the judge ruled that the discrepancy in dates and locations went to the weight the evidence should receive rather than its admissibility and admitted the ad into evidence.

Government's Exhibit 2 ("Exhibit 2") was similarly a Backpage ad admitted during Gravely's testimony.  This ad contained pictures Blanchard took of M.J. at the Travelodge in Portland, Maine on March 27.  Gravely was present both when the pictures were taken and when the ad was created that same day. Blanchard again objected that there were material differences between the physical ad that the government sought to admit into evidence and Gravely's testimony -- namely, the date of posting (March 27, according to Gravely's testimony, whereas the ad itself indicated that it was posted on March 31) and the location of its

---

[4]  The government did not present any documentation from Backpage to verify this statement.

-10-

posting (Portland, Maine, according to Gravely's testimony versus Quincy, Massachusetts, according to the ad).[5]  The district court stated that there was an adequate foundation "to establish that certainly these pictures are part of the ad that he did post on [March 27]."  The district court requested a foundation as to the text before it would be admitted, but ultimately it again held that any discrepancies went to weight rather than admissibility. On this basis Exhibit 2 was admitted into evidence.

We find that it was not an abuse of discretion for the district court to admit Exhibit 1 as a Backpage ad that was created and posted in Maine prior to the trip to Boston.  Moreover, even if the discrepancies in Exhibit 1 did sufficiently undermine this claim, additional evidence at trial further supported the authenticity of Exhibit 1.  United States v. Espinal-Almeida, 699 F.3d 588, 609 (1st Cir. 2012) ("[I]f evidence is admitted prematurely, a new trial is not warranted when later testimony cures the error.").  After Exhibit 1 was admitted, Gravely further testified that Exhibit 1 was reposted in Portland on March 27 after the trio moved there from Bangor, thus explaining the date and location of posting listed on Exhibit 1.  In addition, Philbrook

---

[5]  The government suggested during cross-examination of Blanchard that Exhibit 2 was reposted in the Boston area on March 31, but Blanchard was not charged with any offense in connection to this and there was no direct testimony to that effect.

testified that Gravely took pictures of her in the Motel 6 in Bangor, Maine, that the pictures in Exhibit 1 were some of those pictures, and that she later saw customers in the Motel 6.[6] Howland testified that during the trip to Boston she saw Philbrook and M.J. looking at a webpage that she later realized was Backpage. She later found Exhibits 1 and 2 on her phone and showed them to a Boston police officer who picked her up at the hotel. Mark Keller, a Portland police officer, testified that Howland showed him Exhibit 1 on her cell phone when he interviewed her upon her return to Portland on March 29. Keller further testified that when Howland showed him the ad he recognized it as one he had seen in the previous week during one of his daily searches of Backpage escort ads. Keller saw that there was a second ad linked to the

---

[6]  The defendant argues that Philbrook's testimony that the exhibit was not identical to the Original ad, that that one had more pictures and a different sales pitch, suggests that the document was not properly authenticated. First, we note that the exhibit had already been admitted at this point in the trial, so if Blanchard wanted to argue that Philbrook's testimony undermined the authenticity of the exhibit the best course would have been to renew his objection. Having failed to do so we are left to query whether it was plain error for the district court to allow the evidence to remain admitted after it heard Philbrook's testimony. We do not find that it was. Philbrook conceded that Exhibit 1 was an ad for prostitution that contained pictures taken of her by Gravely in Blanchard's presence on March 13. Moreover, she states that the two did create an ad on that date and that as a result of the ad she subsequently met with customers at the same motel. Therefore the ad admitted into evidence remained relevant and authenticated in crucial respects.

first and was able to go on Backpage and find Exhibits 1 and 2 "live" (meaning, anyone searching Backpage, whether police officers or potential clients, would find them posted).

The duty of the trial court is to determine if a reasonable person could decide that the ads are what they purport to be (in the case of Exhibit 1, a Backpage ad of Philbrook created in Maine and posted prior to the trip to Boston). Holmquist, 36 F.3d at 164. Gravely's testimony as to the ads' content is sufficient to create this foundation. It is for the jury to weigh the impact of Gravely's background and cooperation with the government in deciding whether the ads were in fact posted on the dates and at the locations alleged by Gravely. Id.

Exhibit 2 presents a somewhat more complicated fact pattern, however, because Gravely could not explain the discrepancies between what he knew about when and where the ad was created and the date and location of posting evident on the exhibit. Indeed, he was directly asked by the government "do you know whether [Blanchard] ever reposted the Backpage ad for M.J.?" and he responded that he did not know. There was additional evidence that Exhibit 2 was originally created and posted in Maine, however. Mark Keller, the Portland police officer, testified that he recognized the background of the pictures taken in Exhibit 2 as being the Travelodge in Portland, Maine. Moreover, Chris

Fitzpatrick of Homeland Security testified that included with the ads subpoenaed from Backpage were the IP addresses used to post the ads. From the IP addresses listed on Exhibit 2 he was able to determine that the ad was originally posted from the Travelodge in Portland, Maine. Taken together, this testimony provides sufficient evidence for a reasonable person to conclude that the Exhibit 2 was a Backpage ad that was created and posted in Portland, Maine prior to the trip to Boston. Moreover, even assuming, arguendo, that there was an error in admitting Exhibit 2, the extensive evidence against Blanchard, including the testimony of Gravely, Philbrook and Howland corroborated by Keller and Fitzpatrick, was sufficient to render the admission of these two exhibits harmless. United States v. Ladd, 885 F.2d 954, 957 (1st Cir. 1989) ("[A] new trial is unnecessary if it can be said 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946))).

Blanchard points to our previous case law finding proper authentication, to suggest, inter alia, that someone with knowledge of why there were the discrepancies in the ads needed to testify in order to authenticate them. Savarese, 686 F.3d at 10-11; Espinal-Almeida, 688 F.3d at 609-10; and United States v. Ladd,

-14-

885 F.2d 954, 956-57 (1st Cir. 1989). On the facts of this case we are not prepared to say that the government was required to produce such testimony. The cumulative evidence concerning the ads from Gravely, Philbrook, Howland, Keller and Fitzpatrick provided sufficient evidence to authenticate the ads as Backpage ads that were created in Maine prior to the trip to Boston.

More to the point, unlike the defendants in Saverese, Espinal-Almeida and Ladd, who each argued that the evidence in question (photocopies of false identifications, a GPS device and a blood sample, respectively) was subject to falsification, Blanchard makes no such argument here. In fact, he does not explain why this court should require expert testimony to explain the discrepancies except to state that without such testimony there is insufficient evidence that the ads are what they purport to be. He does not, for example, make a chain of custody argument, such as was made in Ladd or in Espinal-Almeida. 885 F.2d at 956-57; 699 F.3d at 609-10. Such an argument only applies when the item in question is not readily identifiable (such as a vial of blood as in Ladd or a GPS device as in Espinal-Almeida). See United States v. Luna, 649 F.3d 91, 103 (1st Cir. 2011) ("[E]vidence . . . is properly admitted if it is readily identifiable by a unique feature or other identifying mark. On the other hand, if the offered evidence is of the type that is not readily

-15-

identifiable or is susceptible to alteration, a testimonial tracing of the chain of custody is necessary." (quoting United States v. Anderson, 452 F.3d 66, 80 (1st Cir. 2006))). The ads here, however, were easily distinguishable such that Gravely could point to material differences between his memory of the Original ads and Exhibits 1 and 2.[7]

_____

[7] Because Gravely was present at the ads' creation and testified to their content, this case is distinguishable from those found in other circuits where the courts have failed to uphold the authentication of digital evidence and renders it more closely analogous to those instances where our sister circuits have upheld the admission of evidence obtained from the internet. Compare United States v. Vayner, 769 F.3d 125, 131 (2d Cir. 2014) (overturning admission of a webpage when the government was unable to present testimony of anyone with knowledge as to who in fact created the webpage) and United States v. Jackson, 208 F.3d 633, 638 (7th Cir. 2000) (affirming exclusion of website postings where there was no evidence presented as to who created the postings), with United States v. Needham, 852 F.3d 830, 836 (8th Cir. 2017) (holding that "[e]xibits depicting online content may be authenticated by a person's testimony that he is familiar with the online content and that the exhibits are in the same format as the online content") and Browne, 834 F.3d at 408-15 (rejecting as self-authenticating Facebook chat logs when relevance turned on authorship, but referring to testimony from participants in the chats as to their contents as aiding in authentication) and United States v. White, 660 F. App'x 779, 783 (11th Cir. 2016) (holding e-mails to have been properly authenticated when a witness with knowledge testified that they accurately represented an e-mail exchange between himself and the defendant) and United States v. Barnes, 803 F.3d 209, 217 (5th Cir. 2015) (accepting admission of Facebook messages when a witness testified that she saw the defendant using Facebook, recognized his account and his style of communicating reflected in the messages the government sought to introduce) and United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007) (finding properly authenticated e-mails and transcripts of instant-message chats when a participant in those communications testified that they were accurate records of the

Given the facts of this case, a reasonable person could deem Exhibits 1 and 2 to be Backpage ads created and posted in Maine prior to the group's trip to Boston and we do not find that the district court abused its discretion in admitting them.

## III.  **Admissibility of Similar Bad Acts Information**

We now turn to Blanchard's claim that he was denied a fair trial because inadmissible information about similar bad acts was presented to the jury.  In so arguing he evokes Rule 404 of the Federal Rules of Evidence, governing when character evidence may be presented to the jury.  "We review a district court's ruling on the admissibility of evidence under Rule 404(b) for an abuse of discretion."  United States v. Landry, 631 F.3d 597, 601 (1st Cir. 2011).

During direct examination, Blanchard, inter alia, denied having told Gravely that he could make money through prostitution; denied having anything to do with the prostitution Philbrook and Gravely engaged in in Bangor, Maine, and, in particular, denied having ever participated "in the writing [and posting to the internet] of a Backpage advertisement involving Ms. Philbrook" either in Bangor or in Portland; stated that it was Gravely who invited both M.J. and Howland to join them; denied making or

conversations).

assisting in making any Backpage ads in Boston; and testified that the phone associated with the number listed in Exhibit 2 did not belong to him but rather to Gravely despite containing phone calls to Blanchard's mother in its call history.

During cross-examination of Blanchard, the government inquired about a number of alleged acts that occurred after the events charged at the trial.  Among other things, the government asked: (1) whether Blanchard used the phone number given in Exhibit 2 to call other escorts; (2) whether Blanchard reposted Exhibit 2 on March 31 in Boston; (3) whether nine days later the same phone number was used in a Backpage ad for two more women; (4) whether those same women showed up three days later in another Backpage ad; (5) whether the pictures for the latter two ads were taken at the apartment of a woman named Torrie Mitchell; and (6) whether Blanchard and Gravely were prostituting Torrie Mitchell using Backpage ads.[8]

---

[8]  The government argues that Blanchard did not preserve objections as to all of this evidence at trial.  During cross-examination on the first point Blanchard's attorney objected "to testimony from the prosecutor about what numbers go to, who's at the other end of the numbers, et cetera."  The district court ruled that as long as the prosecutor had "a good-faith basis for inquiring of that, she can inquire into it."  Following the questions that elicited evidence on points two through five above, Blanchard's attorney requested a sidebar and objected, stating "[t]his is obviously extrinsic evidence.  This is I believe allegations that postdate the allegations in this case, and I would object."  The prosecutor's response only went to the Torrie Mitchell question, but the objection fairly reached all of the evidence identified in

Blanchard argues that these are evidence of other bad acts and cites Rule 404(b), which provides that "[e]vidence of a crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Blanchard fails to fully grapple with the evidentiary issues raised by the timing of this evidence's admission, however.[9] It is significant that the evidence of Blanchard's other alleged bad acts was introduced on cross-examination of Blanchard. In particular, Blanchard completely ignores Rule 404(a)(2)(A), which states that "a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it."[10]

This circuit "employs a two-part test to determine admissibility of evidence under Rule 404(b)." Landry, 631 F.3d

---

numbers two through six above. We therefore find that there was a preserved objection to all of the evidence.

[9] Indeed, the government argues that because the admitted evidence came in during cross-examination the issue is more properly evaluated under Rule 611(b) governing the scope of cross-examination rather than Rule 404 as Blanchard asserts. Both rules are applicable. Because we find no error under Rule 404 as argued by the defendant we need not evaluate whether 611(b) gives the government an independent path to admitting the evidence.

[10] "Bad acts committed subsequent to the charged behavior are admissible under rule 404(b) as long as they meet the criteria set forth in the Rule." Landry, 631 F.3d at 601.

at 601-02.  First, the evidence has to have "'special' relevance other than establishing propensity," id. at 602 (quoting Udemba v. Nicoli, 237 F.3d 8, 15 (1st Cir. 2001)), and second, the evidence must not be excludable under Rule 403 "because the danger of unfair prejudice substantially outweighs the probative value" of the evidence, id.

This circuit has specifically held that under Rule 404(b) character evidence may be admitted "to rebut a defense of innocent involvement."  Id.  Indeed, we fail to see how Blanchard's case is at all materially different from the situation we evaluated in United States v. Rodríguez where we held that it was not an abuse of discretion for the district court to admit evidence of the defendant's involvement in an uncharged event of drug importation because it was presented to counter the defendant's claim that he "was innocently caught up with others who, if they intended a crime, had not told him their purpose." 215 F.3d 110, 119 (1st Cir. 2000).  By presenting evidence of the defendant's involvement in similar bad acts the government gave the jury a reason to conclude that the defendant was not an innocent bystander but a "knowing and intentional participant in the crimes charged in the indictment."  Id.

Similarly, in United States v. Lugo Guerrero we held that it was not an abuse of discretion to admit evidence of the

defendant's involvement in prior robberies to rebut his assertions that his presence with the other two alleged robbers was innocent. 524 F.3d 5, 14 (1st Cir. 2008). We specified that the evidence of the prior robberies "makes it unlikely that his presence . . . was a mere coincidence." Id. Here Blanchard testified that he was merely present when Gravely and Philbrook engaged in acts of prostitution both in Maine and in Massachusetts and was an innocent passenger in their trip from Maine to Boston. The government was therefore entitled to present evidence of Blanchard's ongoing engagement and contact with individuals engaging in prostitution to demonstrate that it was unlikely that his presence with Gravely and Philbrook was "mere coincidence." Id.

Under the second part of the test, whether the evidence should have been excluded under Rule 403 because it was more prejudicial than probative, we give "great deference" to the district court's in-the-moment determination. Landry, 631 F.3d at 604 (quoting United States v. Shinderman, 515 F.3d 5, 17 (1st Cir. 2008)). We have elsewhere held that "it is only unfair prejudice which must be avoided." United States v. Rodríguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989). We have found unfair prejudice when the evidence "invites the jury to render a verdict on an improper emotional basis." United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000). Nothing in the government's

questions to Blanchard appears to be inviting the jury to render a verdict on an "emotional basis." Id. He testified on the stand that he had nothing to do with Gravely's prostitution business, and, in response, the government presented evidence that he had an ongoing engagement with prostitution. This evidence was admissible under Rule 404(b) and nothing particular to that evidence strikes us as unfairly prejudicial under Rule 403.

## IV. Pro Se Supplemental Brief Issues

Finally, we address the arguments Blanchard makes in his pro se brief. Blanchard argues: (1) that evidence of intent was insufficient under 18 U.S.C. § 2421; (2) that the trial court's jury instructions were erroneous because they failed to require proof that the appellant knew in advance that transportation in interstate commerce was for an immoral purpose; and (3) that the trial court erroneously denied a mistrial motion following the alleged introduction of extrinsic evidence that Blanchard had been previously convicted of a drug crime.

We find none of these arguments persuasive. First, the witnesses' corroborated testimony provided sufficient evidence that before Blanchard left Maine, he intended that the women traveling with him to Boston would work as prostitutes. We must read the evidence in the light most favorable to the verdict. Savarese, 686 F.3d at 5. Read in that light, the evidence showed

-22-

that in the time leading up to the trip to Boston Blanchard was actively aiding Philbrook and M.J. to prostitute themselves. The evidence also demonstrated that Blanchard, Gravely and the three women travelled together from Maine to Boston and that once in Boston they immediately attempted to engage the women in prostitution, including attempting to post an ad on Backpage, going to "walk the track," and providing advice to Howland on where to walk and how to act in order to attract clients. In short, there was sufficient evidence of intent for the jury to have convicted Blanchard of aiding and abetting the transportation of individuals across state lines for purposes of prostitution. See United States v. Tavares, 705 F.3d 4, 17 (1st Cir. 2013) (The element of intent "requires proof that 'criminal sexual activity [was] one of the several motives or purposes . . . not a mere incident of the trip or trips, but instead was at least one of the defendant's motivations for taking the trip in the first place.'" (quoting United States v. Ellis, 935 F.2d 385, 390 (1st Cir. 1991))).

Second, the trial court's jury instructions clearly required the jury to find that Blanchard had the requisite intent at the time of the transportation. The trial court instructed the jury:

> For you to find Mr. Blanchard guilty of [transportation of an individual in interstate commerce to engage in prostitution] . . . the Government must prove each of the following

-23-

> things beyond a reasonable doubt: First, that
> Mr. Blanchard knowingly transported an
> individual in interstate commerce; and second,
> that at the time of such transportation Mr.
> Blanchard intended the individual he
> transported would engage in prostitution.

This instruction demands that the jury find beyond a reasonable doubt that at the time of the transportation of the three women Blanchard intended that the women would engage in prostitution. We find no error in these instructions.

Finally, the district court correctly denied Blanchard's motion for a mistrial made because Blanchard believed that the jury heard improper extrinsic evidence about Blanchard's prior drug dealing. Gravely testified that when Blanchard arrived in Boston Blanchard said "[t]hat he knew a new way to make money besides selling drugs." The testimony was ambiguous at best, as Gravely had already testified that he himself had multiple convictions for selling drugs. It is therefore not at all clear that Gravely was testifying to Blanchard's own previous drug convictions. Moreover, the trial judge offered to give the jury a curative instruction, which defense counsel declined. If there was any error at all, it certainly was not of a kind that would merit a mistrial, which we have held "is a last resort that is only ordered if the demonstrated harm cannot be cured by less drastic means." United States v. De Jesús Mateo, 373 F.3d 70, 72 (1st Cir. 2004). The trial judge offered Blanchard a less drastic

-24-

means, in the form of a curative instruction, which he declined. He therefore can have no complaint that he was denied a more drastic means in the form of a mistrial.

## V.  <u>Conclusion</u>

For the foregoing reasons, we **affirm**.

**<u>Affirmed</u>.**